## AFFIDAVIT OF DEA TASK FORCE OFFICER MARK J. CONCANNON

I, Mark J. Concannon, a Task Force Officer with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am a Task Force Officer ("TFO") of the Drug Enforcement Administration ("DEA") and have been so employed since October 2012. As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.

2.      In 2003, I graduated from the Massachusetts Criminal Justice Training Council basic reserve intermittent academy. In 2005, I graduated from the Massachusetts State Police Academy. I have been a police officer since 2005. As a Massachusetts State Trooper, I was initially assigned to patrol out of the Danvers and Norwell Barracks, and then to the Community Action Team in the city of Brockton working in a high-crime area focusing on gang and drug activity.  In October of 2012, I was assigned to the Division of Investigative Service and to the DEA working as a TFO in the Boston Tactical Diversion Squad. Since the spring of 2017, I have been assigned to the Boston Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force, which is a strike force incorporating various law enforcement agencies, including DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.

3.      I have a Bachelor of Science degree in Criminal Justice from the University of Massachusetts, Lowell. I have attended numerous narcotics investigation courses, including a two-

week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4.     During my time as a police officer and TFO, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. A number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.     During my time with DEA, I have participated in numerous wiretap investigations, and I have been the case agent and affiant for one such investigation. In connection with my participation in prior wiretap investigations, I have listened to intercepted communications, reviewed transcripts of those communications, and reviewed intercepted text messages and Blackberry pin to pin messages. I also have conducted physical surveillance in connection with wiretap investigations, as well as utilized global positioning system ("GPS") devices on

automobiles and GPS information for cellular telephones to surveil targets of wiretap investigations. I have worked with cooperating witnesses in conjunction with wiretap investigations and have debriefed targets of wiretaps after they have been arrested. I also have executed search warrants during the course of wiretap investigations and participated in seizures of drugs and drug proceeds in connection with such investigations. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification and investigation.

6.      Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection and laundering of money that constitutes the proceeds of narcotics-trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.

7.      I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the common appearance, packaging, texture, and smell of the narcotics listed above.

8.      I have participated in the below-described investigation since November 2019. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of the DEA, Massachusetts State Police ("MSP"), Homeland Security Investigations ("HSI"), other federal, state, and local law enforcement agencies. I make this affidavit based upon personal knowledge derived from my participation in this investigation

3

and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

    (1)    My training and experience investigating drug-trafficking;

    (2)    Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

    (3)    Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

    (4)    Confidential sources of information;

    (5)    Public and Business records;

    (6)    Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    (7)    GPS tracking device data;

    (8)    Drug and money seizures;

    (9)    Queries of law enforcement records and intelligence databases; and

    (10)    Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

## PURPOSE OF AFFIDAVIT

9.    This affidavit is being submitted in support of a criminal complaint against the following individuals:

    (1)    Cesar Alejandro CASTRO Pujols, a/k/a Nelson Rivera Gonzalez, a/k/a Bryan Canales, a/k/a Yensi Rosario Mendez ("CASTRO");

    (2)    Andre HERAUX Martinez, a/k/a Jeziel Silva Maldonado ("HERAUX");

    (3)    Fermin CASTILLO ("CASTILLO");

    (4)    Saturnino GUERRERO ("GUERRERO");

    (5)    Kevin CARMONA Victorino ("CARMONA"); and

(6)     Kevin HAYES ("HAYES"),

charging that beginning at least in or about February 2019 and continuing until the present, did

knowingly and intentionally combine, conspire, confederate, and agree with each other and others

known and unknown, to possess with intent to distribute and to distribute controlled substances,

including cocaine, a Schedule II controlled substance, and 400 grams or more of fentanyl, a

Schedule II controlled substance, in violation of 21 U.S.C. §846; and

(1)     Cesar Alejandro CASTRO Pujols, a/k/a Nelson Rivera Gonzalez, a/k/a Bryan Canales, a/k/a Jorge Figueroa Astor, a/k/a Yensi Rosario Mendez ("CASTRO");

(2)     Andre HERAUX Martinez, a/k/a Jeziel Silva Maldonado ("HERAUX");

(3)     Fermin CASTILLO ("CASTILLO");

(4)     Saturnino GUERRERO ("GUERRERO");

(5)     Kevin CARMONA Victorino ("CARMONA");

(6)     Songfeng Chen ("SONGFENG"); and

(7)     Chi YING,

charging that beginning at least in or about March 2020 and continuing until the present, did

knowingly and intentionally combine, conspire, confederate, and agree with each other and others

known and unknown, to launder money, in violation of 18 U.S.C. §1956(h) (collectively, the

"Target Offenses").

10.     This affidavit is also being submitted in support of applications for search warrants

for the following target locations, which are described in greater detail below and in attachments

to the relevant warrant applications and warrants:

1) 176 Brook Road, Apt. 1 and rear detached garage, Milton, Massachusetts (hereinafter, "CASTRO's residence" or "Target Location #1");

2) 1366/68 River Street, left rear apartment, Hyde Park, Massachusetts, (hereinafter, "HERAUX's residence" or "Target Location #2");

3) La Bamba Market, 1 Lorne Street, Dorchester, Massachusetts (hereinafter, "La Bamba Market" or "Target Location #4");

4) El Rincon restaurant, 18 Fairmount Avenue, Hyde Park, Massachusetts (hereinafter, "El Rincon" or "Target Location #5");

5) 13 Shetland Street, Apt. 419, Roxbury, Massachusetts (hereinafter, "GUERRERO's residence" or "Target Location #6");

6) 37 Holworthy Street, Apt. 2, Dorchester, Massachusetts  (hereinafter, "CARMONA's residence" or "Target Location #7");

7) 229 North Central Avenue, Quincy, Massachusetts (hereinafter, "SONGFENG's residence" or "Target Location #8");

8) 160 Pleasant Street, Apt. 801, Malden, Massachusetts ("YING's residence" or "Target Location #9"); and

9) 55 Larch Lane, Centerville, Massachusetts (hereinafter, "HAYES' residence" or "Target Location #10")

(collectively, the "Target Locations").

11.    This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Target Subjects identified herein have committed the above-described controlled substance and/or money laundering offenses and that evidence, fruits, and instrumentalities of that offense will be found in the Target Locations as described below.

**Summary of Evidence**

A. ***Background of the Investigation***

12.    In October 2019, the Boston DEA Strike Force began investigating a Sinaloa, Mexico-based drug trafficking organization (the "Sinaloa DTO") after the Sinaloa DTO delivered 17 kilograms of fentanyl and 23 kilograms of cocaine to Massachusetts, which were seized by

investigators. Interceptions over phones used by some of the Target Subjects began in March 2020 and terminated in March 2021. Based on the investigation to date and as detailed herein, I believe that multiple United States drug cells are being supplied by the Sinaloa DTO with fentanyl and cocaine, which the leaders of the drug cells then distribute throughout the United States. Some of the leaders of these cells are connected because they are being supplied by the Sinaloa DTO, and others are connected because the DTO uses couriers, including truck drivers, to distribute drugs inside the United States after they are imported from Mexico or the Dominican Republic. The leaders of the cells, such as CASTRO, are responsible for distributing drugs to other drug traffickers, such as GUERRERO, and to collect drug proceeds from traffickers who were supplied by the Sinaloa DTO or other cells. The Sinaloa DTO uses illicit money brokers located throughout the United States to collect drug proceeds from the leaders of the cells, which are then laundered and repatriated back to Mexico and the Dominican Republic.

13.     Through interceptions over CASTRO's phones (Target Telephones #12, #13, #14, #15, #16, and #17), and physical surveillance observations, investigators have identified additional members of the Sinaloa DTO who supply drugs to CASTRO and other drug traffickers and gathered evidence of how the DTO is laundering drug proceeds. CASTILLO, who is believed to reside between Mexico and the Dominican Republic, works for the Sinaloa DTO to coordinate the importation of drugs from Mexico and the Dominican Republic, the distribution of drugs inside the United States, and the laundering of drug proceeds back to Mexico. FNU LNU, a/k/a "Bobby" ("BOBBY") resides in the Dominican Republic and is one of CASTRO's most trusted associates. Intercepted calls indicate that BOBBY assists CASTRO with obtaining drug shipments and laundering drug proceeds.  HERAUX and CARMONA are drug and money couriers for CASTRO. Ingrid Pinales ("INGRID"), CASTRO's paramour, has been intercepted discussing CASTRO's

drug business and the loss of drug proceeds (either through thefts or seizures). Wascar Pinales ("WASCAR") and Darywn Pinales ("DARYWN") are believed to be related to INGRID and have close associations with CASTRO. GUERRERO is a longtime drug customer of CASTRO. HAYES is a drug customer of GUERRERO, who redistributes drugs to his own customer base. YING and SONGFENG work for Asian money laundering organizations ("MLO") that launder drug proceeds for the Sinaloa DTO.

14.     Throughout the investigation, CASTRO has used numerous vehicles that have hidden compartments ("hides") to store and transport drugs and drug proceeds. CASTRO alternates the use of these vehicles to avoid the detection of law enforcement and rival drug traffickers. Thus far, investigators have identified at least four of these vehicles, including a Honda Pilot, which is registered to HERAUX under an alias name (the "Honda Pilot"); a Jeep Cherokee, which is registered to CASTILLO's brother, Felix Castillo (the "Jeep Cherokee"); a Honda Crosstour, which is registered to CARMONA (the "Crosstour"); and a Honda Odyssey minivan (the "Odyssey"), which is registered to Elyn Norberto Arias Garcia, 21 Shandon Road, Dorchester, Massachusetts, which have all been used to store or transport drugs and drug proceeds.

15.     To launder its drug proceeds, the Sinaloa DTO places "contracts" with money brokers, including Chinese money brokers located in Mexico and the United States, who have extensive networks of money launderers located throughout the United States.  To start the process, the DTO places the contracts with the money brokers to identify the most favorable rate. When accepting the contract, the broker agrees on a set commission, which is usually based on the amount of money to be laundered. The broker and the DTO exchange a code word, U.S. based phone number(s), and the serial number of a dollar bill. The broker then passes the code word, serial number, and phone number to money launderers with whom they work. The U.S. based

money launderer and drug trafficker then contact each other using the numbers that were exchanged, confirm the code word and serial number, and schedule a time and location for a money pickup. The purpose of exchanging the code word and serial number is to ensure that the person picking up the drug proceeds is the correct person. After the money launderer picks up the drug proceeds from the drug trafficker, the launderer then conducts financial transactions which results in the drug proceeds being repatriated back to Mexico.

16.     During the course of this investigation, the Sinaloa DTO has placed several contracts with money brokers to launder their drug proceeds. CASTRO is in charge of collecting drug debts from other traffickers in the New England region who are also supplied by the Sinaloa DTO and then delivering the proceeds to launderers who work for the money brokers. CASTRO has delivered drug proceeds to launderers who work for illicit money brokers. For example, on October 21, 2020, a female identified thus far as "CINDY" accepted a contract to launder $100,000 for CASTRO, which CARMONA delivered to YING, who works with CINDY. On November 5, 2020, investigators seized $100,020 from SONGFENG after CARMONA delivered the money to him. Prior to the seizure, investigators intercepted SONGFENG and CASTRO exchanging a serial number and arranging for the money pickup.

17.     CASTRO and CASTILLO have also unwittingly delivered drug proceeds to undercover agents ("UCs") who were posing as money brokers/launderers as part of separate undercover investigations targeting illicit money brokers.[1] On November 30, 2020, HERAUX delivered $75,000 to a UC at the La Bamba Market for the purposes of laundering the money. On December 10, 2020, CASTILLO arranged to meet with a UC to deliver $100,000 in drug proceeds,

---

[1] After the UC accepts the contract and picks up the drug proceeds, the money is wired through UC accounts to accounts held by DTOs.

which CARMONA ultimately delivered. On January 8, 2021, HERAUX delivered $150,020 to a UC, which was seized by investigators. And, on February 1, 2021, CARMONA delivered $100,000 to a UC after CASTRO negotiated the contract. In all of the instances in which the UCs accepted the drug proceeds, the UC phone numbers had been passed to a member of the DTO by money brokers after CASTRO or another member of the DTO contacted the money broker with a contract to launder money.

18.     As detailed below, in addition to coordinating money drops, investigators have also intercepted CASTRO using Target Telephones to acquire and distribute drugs. GUERRERO, the user of Target Telephone #19, was first intercepted over a 2018 state wiretap investigation, and intercepted calls indicate that he continues to purchase large quantities of cocaine and fentanyl from CASTRO. On March 16, 2021, investigators seized half a kilogram of fentanyl from GUERRERO, which CARMONA had delivered.

19.     In addition to intercepting phones used by CASTRO, investigators have obtained federal warrants to obtain the location data for phones used by numerous Target Subjects, including CASTRO, HERAUX, CARMONA, GUERRERO, and SONGFENG, and to install GPS tracking devices on vehicles used by members of the DTO to conduct drug and money transactions. Based on intercepted calls, data location information for phones and vehicles, and physical surveillance, investigators believe that CASTRO resides at 176 Brook Road, Milton, Massachusetts (Target Location #1) with INGRID, and that HERAUX moved from 79 Poplar Street, Roslindale, Massachusetts ("79 Poplar Street") to 1366/1368 River Street, Hyde Park (Target Location #2). During the course of the investigation, CASTRO and HERAUX frequented 800 Hyde Park Avenue, Hyde Park ("800 Hyde Park Avenue") and the El Rincon restaurant (Target Location #5) on a near daily basis. INGRID works at El Rincon, and based on intercepted

10

calls and surveillance, investigators believe CASTRO conducts some of his drug and money laundering business from El Rincon. CASTRO has frequently used the La Bamba Market (Target Location #4) to collect drug proceeds from customers and to transfer drugs and drug proceeds to money launderers. Investigators know that La Bamba Market is owned by the CASTILLO family. Based on the investigation, investigators believe CASTRO, CASTILLO, and HERAUX use all of these locations to either store drugs and/or drug proceeds.

20.     Based on intercepted calls, physical and electronic surveillance, toll records, and seizures, investigators believe that CASTRO continues to receive multi-kilogram quantities of drugs, which he then uses his couriers to redistribute to other traffickers connected to the Sinaloa DTO. The investigation has also revealed that CASTRO is collecting substantial amounts of drug proceeds from numerous drug traffickers throughout the Northeast to be laundered on behalf of the Sinaloa DTO, many of whom are not believed to be CASTRO's own customers, but rather other drug cell leaders who are supplied by the Sinaloa DTO.

21.     As detailed herein, investigators have made numerous drug and money seizures from the Target Subjects during the course of the investigation. Based on the scope and long-term and daily drug trafficking activities of the Target Subjects, there is probable cause to believe that evidence of the Target Offenses will be found in each of the Target Locations.

**B.   _Title III Electronic Surveillance_**

22.     On July 17, 2020, the Honorable Allison D. Burroughs United States District Judge, District of Massachusetts signed an Order (hereinafter, the "July 17 Order") authorizing the interception of wire and electronic communications over (857) 352-9998 (referred to therein as "Target Telephone #12"), used by CASTRO. CASTRO was referred to in that affidavit as "UM9998."

23.     On September 30, 2020, Judge Burroughs signed an Order (hereinafter, the "September 30 Order") authorizing the interception of wire and electronic communications over (860) 313-8721 ("Target Telephone #13") and wire interceptions over (617) 708-4092 ("Target Telephone #14'), both used by CASTRO.

24.     On December 11, 2020, Judge Burroughs signed an Order (hereinafter, the "December 11 Order") authorizing the initial interception of wire and electronic communications over (617) 751-0868 ("Target Telephone #15") and (412) 218-7265 ("Target Telephone #16").

25.     On February 17, 2021, the Honorable Nathaniel M. Gorton, United States District Judge, District of Massachusetts, issued an order authorizing the interception of wire and electronic communications over Target Telephone #15 and (857) 269-4157 ("Target Telephone #17"), both used by CASTRO; (857) 340-1816 ("Target Telephone #18") used by HERAUX; and (617) 602-6543 ("Target Telephone #19"), used by GUERRERO.

26.     Throughout the course of this investigation, your Honor has signed numerous warrants authorizing the government to obtain precise location information about the Target Telephones and other phones used by Target Subjects and to install GPS devices on vehicles used by the Target Subjects.

## **Probable Cause**

27.     This section details the various roles of the Target Subjects in the charged conspiracy. It is divided into three parts: Part I focuses on drug and money seizures from various Target Subjects (CASTRO, CASTILLO, HERAUX, GUERRERO, and CARMONA); Part II focuses on the scope of the Target Subjects' drug and money laundering businesses and their relationships among each other; and Part III focuses on the Target Locations and the links to criminal activity at those locations.

28.     The Target Subjects have been intercepted using lightly coded language to discuss the purchase and sale of cocaine, which they refer to as "palomas" (Spanish word for doves); "arriba" (Spanish word for up or above); "perico" (Spanish word for parakeet); and "white"; and heroin/fentanyl, which they refer to as "hard"; "brown"; and "abajo" (Spanish word for down). The Target Subjects also use the words "work" and "pesos" to refer to drugs, and "tickets" or "pesos" to refer to money. They have also used the words "car" and "pesos" to refer to quantities of drugs. I know from my training and experience that all of these slang terms are commonly used by drug traffickers.

### Drug and Money Seizures and Money Deliveries to UCs

29.     Over the course of this investigation, investigators have seized drugs and drug proceeds from numerous Target Subjects. These seizures, along with related intercepted communications and surveillance observations, are described herein. Below, I also describe numerous intercepted calls and identify the participants in those calls. Those identifications are based on a combination of several factors, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted communications; and (3) cell phone subscriber information. I base my interpretations of these communications upon my training and experience, the training and experience of other investigators, and my involvement in this investigation. Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision. All times referenced herein are approximate.

***HERAUX delivered $136,010 to a UC.***

30.     On August 21, 2020, another DEA group conducting a separate undercover investigation into a MLO was given the number for Target Telephone #12 to arrange a money pickup in the Boston area. Investigators called the number for Target Telephone #12, but the call was unanswered.

31.     On August 25, 2020, the UC was given the number for Target Telephone #13 to arrange the same money pickup. Investigators called Target Telephone #13 and spoke with a male, later identified as HERAUX, about the pickup. This call was recorded. After communicating with HERAUX over Target Telephone #13, arrangements were made for the money pickup to occur on August 26, 2020, at a predetermined location in Boston.

32.     On August 26, 2020, investigators set up surveillance at 79 Poplar Street. HERAUX was seen leaving the location empty handed and getting into the Honda Pilot. Investigators saw HERAUX reaching down toward the front passenger seat area and appearing to be manipulating something. His furtive movements were consistent with him opening a hidden compartment in the front passenger seat area. Investigators followed HERAUX who was driving the Honda Pilot to the predetermined location. HERAUX got out of the Honda Pilot carrying a red bag, which he retrieved from the front passenger seat area. HERAUX walked to the UC's vehicle, gave the red bag to the UC, spoke briefly with the UC, and then returned to the Honda Pilot. The red bag that HERAUX gave to the UC contained $136,010. Based on my training and experience, my knowledge of this investigation, and the covert nature of the money exchange, I believe the money HERAUX delivered were drug proceeds.

***Investigators seized $100,020 from SONGFENG, after CARMONA delivered the money.***

33.     On November 4, 2020, CASTRO used Target Telephone #13 to exchange a series of text messages with an Asian male later identified as SONGFENG, who was using (617) 580-1630. CASTRO and SONGFENG exchanged a code word ("Tom") and the serial number for a dollar bill ("F17059940L") and arranged to meet to exchange money at a location in Quincy, Massachusetts. I believe the exchange of the serial number was to confirm that SONGFENG was the person who would be laundering the money that CASTRO was delivering, which were drug proceeds that CASTRO had collected from customers of the DTO.

| | |
|---|---|
| CASTRO | Hello |
| *SONGFENG* | *Hi* |
| CASTRO | Tom . . . F17059940L . . . For when they are available |
| *SONGFENG* | *Yes . . . I'm sorry, I am not available to pick up phone call now* |
| CASTRO | Ok sorry . . . They told me to mark you |
| *SONGFENG* | *Do u want to meet tomorrow morning?* |
| CASTRO | Ok |
| *SONGFENG* | *Yes, I told them u have contacted me* |
| CASTRO | Ok |
| *SONGFENG* | *Are they available tomorrow?* |
| CASTRO | Yes |
| *SONGFENG* | *Meet tomorrow 9 Am 219 Quincy Ave, Quincy MA 02169* |
| CASTRO | Hi hey I'm going to send you the address |
| *SONGFENG* | *Wait, let me ask them* |
| CASTRO | Ok |

SONGFENG          *Hey, we usually don't go out. Could you come?*

34.     Based on the investigation to date, investigators believed CASTRO was planning to deliver drug proceeds to SONGFENG, who works for an Asian MLO. I further believe SONGFENG asked CASTRO to deliver the money to him at the address in Quincy because SONGFENG and the other launderers usually do not go out to collect drug proceeds ("Hey, we usually don't go out. Could you come?").

35.     On November 5, 2020, CASTRO and SONGFENG resumed their text messaging exchanges to coordinate a time and location for their meeting. The text exchanges began at approximately 12:44 p.m. (call #506) and were intercepted over Target Telephone #13.

CASTRO          Hello good afternoon are available for today

SONGFENG        *Hi, Yes, I have time between 5:30 to 6:30. Are u coming over?*

CASTRO          Ok good. Between

SONGFENG        *If you're gonna come over, I'm going to send you a new meeting place, also it will be in Quincy*

CASTRO          I will be there before 6,30pm

SONGFENG        *Great, let me know when you are going to come here. I send you a new address. It will around North Quincy. Sorry, because I am not sure when I would be at that time*

CASTRO          Ok

36.     At 5:18 p.m., CASTRO again used Target Telephone #13 to send a text saying his courier was arriving ("Hello in 8 minutes the girl is there."). After this text message, CASTRO used Target Telephone #13 to call SONGFENG to further coordinate. SONGFENG asked if CASTRO had sent a courier. SONGFENG told CASTRO he would send a new address for the meeting ("Okay, I'm sending you a message too, okay?'). SONGFENG and CASTRO exchanged more text messages, all of which were intercepted over Target Telephone #13. SONGFENG texted

the address to CASTRO ("477 Hancock St, Quincy, MA 02171") and then sent a text telling CASTRO that his courier was at the location ("My friend here."). CASTRO then asked via text message what country SONGFENG was from so he could identify the courier ("What country are you from to slip the girl?"), and SONGFENG replied by text that he was from China ("China man."). I believe SONGFENG provided the address for the money exchange and told CASTRO that he and Yuefeng Chen were waiting to collect the money ("My friend here."). I further believe that because the money was drug proceeds, which SONGFENG was planning to launder, he did not want to be waiting in a public area that was exposed to law enforcement surveillance.

37.     After several more text messages and a phone call back and forth trying to locate each other, SONGFENG told CASTRO he was sending him a new address to meet ("118 Holmes street."). A few minutes later, SONGFENG sent a text to CASTRO with the original meet location ("477 Hancock St, Quincy, MA 02171"). After this last text, at 5:52 p.m. (call #535) CASTRO called SONGFENG. CASTRO asked if SONGFENG was outside smoking ("You smoking? Do you smoking?"). SONGFENG affirmed and CASTRO was heard saying to someone, "Yes, that's him." SONGFENG asked if the person who was approaching him was the courier ("Okay. Is that you?"), and CASTRO affirmed ("Yes, yes. Okay, my friend.").

38.     Based on the text exchanges and calls, investigators established surveillance in the area of 477 Hancock Street and 800 Hyde Park Avenue, which was where the location data for CASTRO's Target Telephone #13 and HERAUX's phone indicated they were located. At approximately 4:00 p.m., CASTRO and HERAUX left 800 Hyde Park Avenue in the Honda Pilot. HERAUX dropped CASTRO off at CASTRO's residence (176 Brook Road) and returned to 800 Hyde Park Avenue. At 5:00 p.m., CARMONA got into and left in the Honda Pilot and traveled to Quincy. The Honda Pilot parked on Holmes street, which is a street over from 477 Hancock Street.

At 5:50 p.m., CARMONA got out of the Honda Pilot carrying a white bag and walked toward Hancock Street. CARMONA got into the rear passenger seat of an Audi sedan (the "Audi") with the bag. After approximately one minute, CARMONA got out of the Audi without the bag and walked back in the direction of the Honda Pilot.

39.     At 5:55 p.m., the Audi left the area. At 5:59 p.m., at the direction of investigators, a Quincy police officer conducted a motor vehicle stop of the Audi. The driver was identified by his Massachusetts driver's license as Yufeng Chen and the passenger was identified as SONGFENG. Inside of the Audi, the officer saw in plain view the white bag, which was at the feet of SONGFENG. The bag was seized and found to contain $100,020. SONGFENG claimed the money was being used to start a business. After the money was seized, SONGFENG went to the Quincy Police Department attempting to recover the money. SONGFENG told the officer his phone number was (617) 580-1630 and his address was 229 N. Central Avenue in Quincy (Target Location #8). SONGFENG claimed that he was starting a business and the money had been given by friends. When asked about the names of these friends, SONGFENG declined to give names. Neither SONGFENG nor Yufeng Chen was arrested and neither has had further contact with investigators.

### HERAUX delivered $75,000 to a UC on behalf of CASTRO

40.     In late November 2020, a UC's phone number was passed to a target of a separate and ongoing undercover DEA money laundering investigation after the target requested a phone number and a serial number of a dollar bill be provided to arrange a money pickup in Massachusetts. The UC's number was given to the target by investigators, and afterwards, on November 27, 2020, the UC received a call from Target Telephone #16, which went unanswered.

41.    On November 28, 2020, the UC placed a consensually recorded call to Target Telephone #16 and spoke with CASTRO. After CASTRO confirmed the serial number that the UC had previously provided, the UC and CASTRO agreed to meet a couple of days later to conduct the money pickup. CASTRO and the UC, both using coded references, agreed that the pickup was for $50,000 ("to service a car that had 50,000 miles") and was to occur in a couple of days. In a follow up conversation on November 30, 2020, which was consensually recorded, the UC called Target Telephone #16 and spoke with CASTRO to confirm the time and location for the pickup. After the call, CASTRO (using Target Telephone #16) sent a text message to the UC with the location for the pickup ("5 Lorne St") and confirmed a time for the exchange. CASTRO also confirmed that the amount would be $75,000 ("the correct age is 75") rather than $50,000. CASTRO told the UC that he was sending a courier to deliver the money and that the location of the exchange was "safe," meaning there was no threat of law enforcement detection.

42.    Investigators set up surveillance at the locations known to be used by the Target Subjects, including the La Bamba Market (Target Location #4), 800 Hyde Park Avenue, and 176 Brook Road (Target Location #1). An investigator saw HERAUX driving the Crosstour and leaving a grocery store parking lot near 176 Brook Road. The investigator followed HERAUX in the Crosstour. HERAUX dropped off an unknown male at a location in Hyde Park and then went to 176 Brook Road. At approximately 11:37 a.m., HERAUX pulled into the driveway of 176 Brook Road, where the Crosstour remained for approximately 10 minutes before departing. When the Crosstour left, HERAUX was driving and a male, believed to be CASTRO, was in the passenger seat. HERAUX drove the Crosstour to El Rincon (Target Location #5), where it remained for less than a minute before it returned back to 176 Brook Road.

43.     At approximately noon, HERAUX drove the Honda Pilot from 176 Brook Road to La Bamba Market. HERAUX got out of the Honda Pilot and into the rear passenger seat of the UC vehicle. HERAUX and the UC exchanged a serial number to confirm the pickup, and after doing so, HERAUX gave the UC a brown paper bag containing $75,000. HERAUX got out of the UC vehicle and walked into La Bamba Market while talking on his cell phone. At approximately 12:40 p.m., HERAUX left La Bamba Market, got back into the Honda Pilot, and returned to 176 Brook Road. HERAUX parked the Honda Pilot next to the Crosstour.

### *CARMONA delivered $99,980 to a UC on behalf of CASTILLO.*

44.     CASTILLO traveled to Massachusetts from Mexico on December 9, 2020, and remained here until December 21, 2020. During that time, investigators saw CASTILLO driving HERAUX's Honda Pilot.  On December 10, 2020, a UC involved in an ongoing money laundering investigation received a missed call from CASTILLO, who was using (857) 707-6450,  along with a text message that contained a verbal code for a money pickup ("Pedro de Andres"). Prior to this missed call, the UC was told to expect a call to arrange a money drop and that the code "Pedro de Andres" would be used to confirm the transaction. The UC placed a recorded call to CASTILLO and spoke with him. In a coded conversation, the UC asked CASTILLO how much money was going to be exchanged ("how many miles are on the car") and CASTILLO replied it would be $100,000 ("100"). The UC asked where CASTILLO was located, and CASTILLO replied he was in the "Hyde Park/Milton" area. The UC and CASTILLO agreed to speak later.

45.      Later that day, the UC again spoke with CASTILLO to arrange a location to meet. They agreed to meet at a location in Somerville, Massachusetts. At the agreed upon time and location, the UC again called CASTILLO to tell CASTILLO he was at the location. CASTILLO told the UC he would be sending an associate to bring the money. After this call, CARMONA

arrived at the location and got into the UC vehicle. CARMONA handed the UC a bag, containing $99,980. Investigators saw CARMONA depart the area driving the Crosstour.

**_Investigators seized $150,000 from HERAUX, who was delivering the money on behalf of CASTRO and CASTILLO._**

46.     On January 7, 2021, CASTRO began using Target Telephone #17 to arrange a money pickup with a UC, who was posing as a money launderer. The money pickup was scheduled for January 8, 2021. On January 8, 2021, at 9:32 a.m., prior to the pickup, investigators intercepted a call over Target Telephone #15 between CASTRO and CASTILLO (using a Mexico-based phone number) in which they discussed the details of the money pickup. CASTILLO asked how much money CASTRO planned to drop off ("How much is there?"), and CASTRO said he had at least $150,000 ("What I had told you, a hundred and something. Like 150 and something."). CASTRO said he had talked to the UC and that the money exchange was scheduled for around noon ("It's from 12:00 on."). CASTRO told CASTILLO he would conduct counter-surveillance around La Bamba Market prior to the pickup to make sure no police officers were in the area and would relocate the pickup if necessary ("So, I'm going to check because they were working around there. If they are working, when he calls me, I will send him to the side . . . to this side down here.").

47.     On January 8, 2021, investigators established surveillance in the vicinities of the La Bamba Market (Target Location #4), 1366/1368 River Street (Target Location #2), and 800 Hyde Park Avenue. At approximately 9:47 a.m., HERAUX left 1366/1368 River Street and drove the Crosstour to El Rincon (Target Location #5), where he picked up CASTRO. They then drove to La Bamba Market and returned to 1366/1368 River Street, where HERAUX parked the Crosstour next to the Honda Pilot. Investigators saw HERAUX remove a Coors Light bag from the Honda Pilot, which he took into 1366/1368 River Street. HERAUX and CASTRO left in the

Honda Pilot, went to 176 Brook Road, and then back to El Rincon. HERAUX and CASTRO again left El Rincon and returned to the area of 1366/1368 River Street. Investigators believe CASTRO and HERAUX used the Crosstour to go to all of these locations to collect money in anticipation of the money drop with the UC. At 11:34 a.m., HERAUX exited from 1366/1368 River Street carrying the Coors Light bag, which he placed inside of the Honda Pilot. A few minutes later, HERAUX departed in the Honda Pilot.

48.     Investigators stopped the Honda Pilot at approximately 11:43 a.m. as HERAUX was driving towards the La Bamba Market. Investigators identified HERAUX, who was alone, by his Massachusetts driver's license (issued under an alias name). HERAUX denied that there was any contraband in the Honda Pilot and consented to a search. A K-9 trained in the detection of the odor of narcotics was called to the scene to conduct a sniff. The K-9 alerted to the odor of narcotics, and investigators seized the Honda Pilot and brought it to the MSP barracks to search it. Investigators located a sophisticated electronically operated hidden compartment in the passenger-side dashboard. Inside the hide, investigators recovered several multi-colored plastic bags containing bundles of U.S. currency wrapped in cellophane, totaling $150,020. During the stop, investigators asked HERAUX for a phone number at which he could be contacted, and HERAUX provided the phone number for Target Telephone #18. No drugs were found during the search of the Honda Pilot. HERAUX was released from the scene. After the seizure, CASTRO was intercepted calling BOBBY and INGRID to tell them about the seizure.

49.     On January 11, 2021, investigators called Target Telephone #18 to talk to HERAUX about the money that was found in the hide. HERAUX said he did not know anything about the money. He said the money was not his and that he had bought the Honda Pilot "as is"

from a friend whose name he could not recall. HERAUX told investigators, "I have nothing to hide." HERAUX said he worked at the La Bamba Market stocking shelves.

### HERAUX delivered $100,000 to a UC on behalf of CASTRO

50.     In late January 2021, after interceptions over Target Telephones #15 and #16 had terminated, a UC's phone number was passed to a target (a money broker) of a separate and ongoing undercover money laundering investigation after the target requested a phone number and a serial number of a dollar bill be provided to arrange a money pickup of $100,000 in Massachusetts. The UC's number was given to the target by investigators, and afterwards, on January 28, 2021, CASTRO used Target Telephone #15 to call the UC over the number that had been provided. The call was consensually recorded, and investigators recognized CASTRO's voice.

51.     During the call, CASTRO said the pickup was for "100" (meaning $100,000), and he was "ready." In a follow up call that day, a UC called Target Telephone #15. The UC sent text messages to Target Telephone #15 arranging the pickup for February 1, 2021 around noon. On February 1, 2021, the UC sent a text message to Target Telephone #15, asking to meet at 11:00 a.m. and for an address. CASTRO then used Target Telephone #17 to send the UC the address, which was "133 Brook Road, Milton." The UC replied by text informing CASTRO that he/she was "5 minutes out." CASTRO then called the UC from Target Telephone #17. During the call, CASTRO directed the UC to the driveway of 172 Brook Road, which is the residence adjacent to CASTRO's residence (Target Location #1).

52.     CASTRO told the UC that "the woman" would be out to meet the UC. Within minutes, HERAUX came out of the front door of 176 Brook Road (Target Location #1) carrying a bag. HERAUX got into the UC vehicle and handed the UC the bag. HERAUX told the UC there

23

was "100" in the bag. Inside the bag were smaller plastic bags containing bundles of cash. HERAUX told the UC each bundle contained "10 each."

53.     After inspecting the money, the UC tried to engage HERAUX in conversation. The UC told HERAUX things were "dry" (meaning he was out of drugs) and asked HERAUX to talk to his "father" (meaning CASTRO). After HERAUX left the UC vehicle, CASTRO used Target Telephone #17 to call the UC. The UC told CASTRO that he had told his "son" (meaning HERAUX) that things were "dry." Later that day, the UC sent a text message to Target Telephone #17 to inform CASTRO that the money had been counted and was accurate (meaning $100,000). The UC again asked if CASTRO could help with those "vehicles" (meaning if CASTRO could supply him with drugs). CASTRO said he had talked to the "lady," but he (CASTRO) was in charge of the "money" and could not help the UC with obtaining drugs.

**_Investigators seized fentanyl from HERAUX while en route to deliver the drugs._**

54.     On February 25, 2021, at 7:30 p.m. (call #30), CASTRO used Target Telephone #17 to call (617) 580-7314 and speak to UM7314, who is a drug customer. UM7314 complained that the drugs he had purchased from CASTRO were not good ("Familia! I'm calling you because that stuff is going down/losing potency too much. What you just sent me."). UM7314 told CASTRO to call him over a video call so UM7314 could show CASTRO that the drugs were not mixing properly, that a customer had returned some of the drugs, and that he wanted better drugs ("Call me via camera so you can see all that I had to break down. From a guy who returned everything, and he told me that was losing potency. Being honest with you, everything that you are sending me I'm doing it at three and a half. It doesn't go further than that. So, I need you to get me something good."). CASTRO asked if he could send the additional drugs the following day ("Can you give me until tomorrow?"). UM7314 said he could wait until the morning and again

said that a customer had returned drugs ("I can give you until tomorrow, but it has to be in the morning because this guy returned that."). CASTRO said he would be getting new drugs the following day, which he could send to UM7314 ("I'm telling you because if you give me until tomorrow, because I'm waiting for two things, but until I don't have that in my hands."). UM7314 agreed and CASTRO asked what quantity of drugs UM7314 needed ("How much are you going to need?"). UM7314 said he would check because he had people helping him to mix the drugs ("I'm going to check well, and I will send you a message, because I'm here with some people that are helping me to do something."). CASTRO asked UM7314 to report back on the quality of the drugs CASTRO planned to send the following day ("What I'm going to send you, you have to let me know the numbers right away. Because with you is how I'm going to know."). UM7314 agreed ("I will send that right away. What I need is something good so I can send that to the guy.").

55.     On February 26, 2021 at 11:47 a.m. (call #34), UM7314 called Target Telephone #17 and spoke with CASTRO about the drugs he wanted to purchase. CASTRO asked what quantity of drugs UM7314 wanted ("So, what is it that you want?"). UM7314 replied that he wanted "seven" because he still had drugs left from a prior purchase ("I want seven, because I have little something left there."). CASTRO agreed. UM7314 told CASTRO to send him high quality drugs so he would not have to return any ("What I don't want is to take that out and then have to send it to you back. You get me? Some people have not said anything."). CASTRO said he would "send it over" and UM7314 asked how long it would take to deliver the drugs ("Roughly in how long, Familia?"). CASTRO said it would be about an hour because his courier was not close by ("Well, I don't want to lie to you. So, it will be like in one hour or so, because the guy is not in my area."). UM7314 asked if he could deliver the drugs by 1:00 or 1:30, and CASTRO replied, "Yes." UM7314 again asked for potent drugs ("Alright then. Familia, make sure it's

something really good."). UM7314 said if the drugs were high quality, he would order more ("If it's something really good, I will call you back so you can set aside another little something for me.").

56.     Later that day, at 1:37 p.m. (call #35), CASTRO (using Target Telephone #17) called UM7314 to tell him that HERAUX was approximately 10 minutes away ("Primo, in 10"). UM7314 asked CASTRO to tell HERAUX that someone was waiting to accept the drugs ("Okay. Tell him to arrive there. There's people there already.").

57.     At 1:55 p.m. (call #36), UM7314 called CASTRO to tell him that HERAUX had not arrived ("He has not arrived yet."). CASTRO began to panic ("How could that be? Stay on the line, let me call him. Damn. Primo, let me call you right back. Shit, man, he's not answering the phone.").

58.     At 2:20 p.m. (call #37), UM7314 again called CASTRO. CASTRO asked if UM7314 had seen any police activity in the area ("Have you seen anything around there?"). UM7314 replied that he had not seen anything ("The Prima is around looking, and I'm checking as well. I just headed out to see."). CASTRO asked UM7314 to go out to see if he could find out what happened to HERAUX ("Damn man. Do me that favor. My stomach is all over the place. I already know things are not good because he calls me right away."). UM7314 understood and acknowledged the police could have been in the area investigating UM7314 ("I know man. Imagine I'm the same way because if anything happens to him that could be for me, and I don't even know.").

59.     Based on the earlier intercepted calls, investigators surveilled HERAUX the morning and day of February 26, 2021. At approximately 12:12 p.m., investigators observed HERAUX leaving his residence (Target Location #2) and driving away in the Crosstour.

HERAUX went to 800 Hyde Park Avenue. At 1:02 p.m., HERAUX exited 800 Hyde Park Avenue carrying a large white weighted bag, which he placed into the rear passenger seat of the Crosstour. For a few minutes, HERAUX remained in the rear passenger seat area and appeared to be moving around. At 1:05 p.m., HERAUX left the area in the Crosstour. Investigators followed HERAUX and ultimately, at the direction of investigators, a MSP trooper stopped the Crosstour at 1:45 p.m. on Route 1 North, in Revere, Massachusetts.

60.     The trooper immediately noticed that HERAUX appeared nervous. When asked where he was going, HERAUX initially said he was going to his sister's house. When asked for the address, HERAUX said he was going to see a friend. A K-9 trained in the detection of the odor of narcotics was called to the scene and alerted in the area of the rear passenger seat. HERAUX said the car belonged to "Kevin" and denied there was any contraband inside the vehicle. Investigators towed the Crosstour to the MSP barracks, and HERAUX was released from the scene. Investigators searched the Crosstour and discovered a hide located behind a speaker in the rear cargo area. Inside the hide, investigators found a heat-sealed bag wrapped in green cellophane that had the number "223" handwritten on it. The contents of the bag field tested positive for fentanyl and weighed approximately 263 grams (including the wrapping). The suspected fentanyl was sent to the DEA laboratory for analysis, which is pending.

61.     At 2:49 p.m. (call #151), HERAUX used Target Telephone #18 to call (339) 213-0033 and speak to CASTRO. CASTRO asked if the police had taken the Crosstour ("They took your Guagua?"), and HERAUX confirmed ("Yes."). HERAUX explained that the stop occurred near UM7314's location ("That was when I was about to arrive you know where") and that they had a K-9 on the scene ("Right on the  street. Bam! They didn't even ask me anything. With a dog and everything. Bam!"). HERAUX told CASTRO that the police did not find the drugs ("They

jumped on me immediately with a dog, but they didn't find anything."). CASTRO asked why the police did not take the car, and HERAUX said he was told they wanted to check the car ("They say that they are going to check it out. So, they dropped me off there."). CASTRO replied that the stop was the same as the prior stop in January when investigators seized $150,000 from HERAUX in the Honda Pilot ("Same story as the other day. Same story as that other time."). CASTRO told HERAUX to take a taxi to La Bamba ("Have them drop you off where you work, at the bodega.").

62.     After this call, HERAUX took a taxi to La Bamba Market (Target Location #4), where he was picked up by a vehicle registered to DARWYN, who is believed to be related to INGRID. HERAUX stopped using Target Telephone #18 shortly after the stop. The last location data for Target Telephone #18 indicated it was at El Rincon (Target Location #5) at approximately 4:41 p.m. The location data for CASTRO's phone (Target Telephone #15) indicated it was at El Rincon at the same time.

### *Investigators seized a half kilogram of fentanyl from GUERRERO that CARMONA delivered.*

63.     On March 16, 2021, at 6:44 p.m. (call #366), CASTRO used Target Telephone #15 to call GUERRERO (using Target Telephone #19). CASTRO asked if GUERRERO could meet that evening around 8:00 to pick up drugs ("Do you think that can be done today like at 8:00 or 8:30?"). GUERRERO affirmed, saying he needed more drugs ("Of course, I need it."). CASTRO asked where he should send his courier ("I can tell the guy and you can see him anywhere. You tell me."). GUERRERO asked if they could meet near La Bamba ("At least before La Bamba, around there or somewhere else."). CASTRO said he would send a courier to La Bamba Market ("No, right there at the bodega. I'm going to send El Flaco . . . I'm going to send the skinny guy, not the black guy."). GUERRERO agreed.

64.     At 7:45 p.m., GUERRERO sent CASTRO a text message indicating he was on his way ("I'm on my way. I'll be there at 8. Thanks"). At 8:07 p.m. (call #340), GUERRERO called CASTRO to ask if a courier was en route to deliver the drugs ("Did the person leave?"). CASTRO said the courier would call when he arrived ("He has not arrived. He will be calling me when he gets there."). GUERRERO said he was at La Bamba ("I'm here at the bodega inside the SUV."). CASTRO told GUERRERO to remain there ("Stay right there. It's better there.").

65.     At 8:11 p.m., CASTRO called GUERRERO to tell him that the courier would be arriving ("I called him. He'll be there in eight. Okay?").  CASTRO told GUERRERO he knew the courier ("You'll see him, a skinny guy. You know who he is, my nephew."), and GUERRERO acknowledged ("Yes, I know who he is."). GUERRERO said he was in a "white . . . Highlander.".

66.     At 9:15 p.m. (call #344), GUERRERO called CASTRO to tell him he had been stopped. GUERRERO said, "Talk to me Sanchocho." CASTRO replied, "Talk to me." GUERRERO told CASTRO he had been stopped by police ("Dude, I was grabbed as soon as that young kid got off. I don't know if they found the thing. They took the SUV from me and everything . . . It seems the young kid was being followed. I don't understand. As soon I took off from the bodega they started following me in a black car. I told that young guy, 'Are you in that black car that is going around?' It seems that the black car was following him. So they called the state police. They waited for me at the light of Happy Market. They started following me . . . They took the SUV supposedly because of the license. But I don't know if they found the thing. That is the problem I have now."). CASTRO asked if GUERRERO had the drugs in a hide ("Did you have that in a hide?"). GUERRERO replied that the drugs were stored in the console ("I put it in the drawer normally. Just like that."). CASTRO said the police would find the drugs ("Oh, my Lord. They are going to find that man."). CASTRO said his courier had not yet arrived and told

GUERRERO he should have thrown the drugs out ("Damn man. You should have thrown that shit away.").

67.     Based on the earlier intercepted calls, investigators set up surveillance in the vicinities of 800 Hyde Park Avenue and La Bamba Market (Target Location #4). At approximately 6:49 p.m., HERAUX was seen walking towards 800 Hyde Park Avenue. At 7:49 p.m., the location data for CARMONA's phone indicated it was leaving 37 Holworthy Street (Target Location #7). At 8:06 p.m., CARMONA arrived in the Odyssey at 800 Hyde Park Avenue. At 8:04 p.m., GUERRERO arrived at La Bamba Market driving his white Highlander. At 8:11 p.m., CARMONA departed 800 Hyde Park Avenue in the Odyssey. At 8:20 p.m., CARMONA entered La Bamba Market. Approximately a minute later, CARMONA exited La Bamba Market and got into GUERRERO's Highlander. At approximately 8:22 p.m., GUERRERO dropped CARMONA off in the area where the Odyssey was parked.

68.     At the direction of investigators, an MSP trooper stopped GUERRERO who was driving the white Highlander. GUERRERO was alone and driving with an expired license. Investigators released GUERRERO from the scene. During an inventory search, investigators recovered from the center console a black plastic bag containing a green cellophane wrapped object, the contents of which field tested positive for fentanyl with a net weight of 616 grams. The drugs were sent to the DEA Laboratory for confirmation testing, which is pending.

**The Target Subjects Relationships and Drug Trafficking and Money Laundering Activities**

69.     As detailed above, CASTRO distributes drugs for and collects and launders drug proceeds on behalf of CASTILLO and the Sinaloa DTO. In this section, I describe the relationships among the Target Subjects and detail intercepted calls which explain the nature and scope of their drug trafficking businesses and roles in the conspiracy.

### 1. *CASTRO-CASTILLO-BOBBY*

70.     Based on intercepted calls between CASTRO and CASTILLO and BOBBY, and surveillance observations, I believe CASTRO and CASTILLO partner to purchase large quantities of drugs and launder drug proceeds.

71.     In February 2019, CASTILLO and CASTRO delivered a sample of fentanyl to a DEA cooperating source ("CS"), which had been organized at the direction of investigators. Prior to the purchase, the CS called CASTILLO to coordinate the drug purchase. CASTRO was with CASTILLO when CASTILLO delivered the fentanyl sample to CS, and it was CASTRO who handed the fentanyl sample to the CS.

72.     On October 25, 2020, at 1:32 p.m. (call #892), CASTRO called a Dominican-based phone number ((809) 969-4462) and spoke with BOBBY. Based on intercepted calls, I believe BOBBY is a Dominican-based co-conspirator and trusted associate of CASTRO. During the call, CASTRO told BOBBY that someone had broken into one of his vehicles (a Jeep Cherokee registered in Felix Castillo's name which is equipped with a hide) and stolen $200,000 ("Dude! They hit me so hard! They broke into one of my SUVs, Bobby, and it had like 200,000 pesos that weren't mine, man."). BOBBY asked if the SUV was parked on the street ("Damn, man. And where was it? In the street?"). CASTRO affirmed, saying he had moved it the previous day, and that he had stored drugs in a hide inside the SUV ("Yes, man. But I moved it. I moved it yesterday. I stored a thing there you follow?"). CASTRO said CASTILLO (who he refers to as "Loco" in numerous calls) had called him to tell him discuss a car theft that had happened in the Dominican Republic. CASTRO said that CASTILLO had called and told him to check on what was stored in the hide inside the SUV ("He told me, 'Dude go check and see what you have in the bank there.'"). CASTRO explained that when he got to where the Jeep Cherokee was parked, he realized that

someone had broken into it and that he thought whoever broke into the Jeep Cherokee knew exactly where the hidden compartment was located ("They broke into it Bobby. They destroyed the back, but the thing is, but it had to be someone who knew about that vehicle because they broke. They went directly there."). CASTRO told BOBBY he had a "clean conscious," meaning he was not responsible for the break in and theft of the money. CASTRO was concerned about losing the "money that doesn't belong" to him. BOBBY said CASTRO should be thankful he was not there when the break in happened. CASTRO said that he was grateful that he had not lost more money because he sometimes stored more money in the hide ("Sometimes we kept even more over there. You follow? . . . 200 are 200, Bobby. I am depressed."). BOBBY assured CASTRO that they would figure out how to handle the loss ("We'll figure something out. Don't worry.").

73.     Later that day, at 2:08 p.m. (call #898), CASTRO called (617) 905-4297 to tell INGRID about the break in. The call was intercepted over Target Telephone #14. CASTRO said he had gotten "hit really hard" and that someone had broken into his SUV ("Someone broke in on one of my SUVs and they took around . . ."). INGRID asked where the vehicle was located ("Where was that?"), and CASTRO replied that he had moved it the previous day to store money in it ("I moved it yesterday to put something inside . . ."). INGRID interrupted him, saying she believed whoever broke in knew there was money inside ("I'm going to tell you something. Nobody goes into a vehicle if they don't know what will they find."). CASTRO agreed that it was done by someone who works for him ("No, that's what I am saying. It's one of us."). INGRID agreed ("Of course."). CASTRO said he believed the money was stolen by someone who knew about CASTILLO's drug trafficking business ("Somebody who knew what's up with Fermin, who was the one who was always in that SUV going and driving around."). INGRID suggested that CASTRO likely knows the person who stole the money ("Good thing that you might know who it

is."). CASTRO said he hoped it was someone he knew, rather than being targeted by a drug robbery group, and noted that he had not been out on the streets conducting his drug business ("God willing, but because I am not going out or anything, that's a problem, you follow? Because I am not going out to the street or anywhere."). INGRID agreed, but opined that there were not a lot of people who knew that CASTRO sold drugs or knew who he worked with ("You are not going out, but not a lot of people know what you do and how you do it."). CASTRO again talked about how whoever broke into the Jeep knew exactly where to find the hidden compartment that contained the money ("The thing is, they went directly and broke it. They hit it."). CASTRO said that CASTILLO ("Loco") had asked him why the Jeep was not parked at his mother-in-law's ("So Loco told me, 'Damn, so didn't you have that SUV parked at the mother-in law's?'") and that he told CASTILLO he moved the car around ("I told him, 'Sometimes I park it there, but if I move it, I park it in another place. Like I have always done without any problem until now, after the thing happened."). CASTRO asked INGRID, "What you think?" INGRID said she thought the break in had been planned ("That was set up since some time ago."). CASTRO agreed, and said he warned HERAUX to be careful on the streets because other drug dealers were watching ("I tell Nino, 'Buddy, you have to be careful. They are watching you.'"). INGRID told CASTRO to check all of his vehicles for GPS tracking devices ("Oh man! You have to check all your vehicles."). CASTRO said he did not use the Jeep, but that he thought someone was watching HERAUX ("No, because I don't use that SUV. That's what I tell Nino, 'It was him that they were watching . . . I have been telling this to Nino for some days now. I knew they were watching him."). INGRID suggested parking the Jeep Cherokee in the parking lot "where we sleep." INGRID said CASTRO needed to check all of his vehicles to determine if a rival drug organization had placed GPS tracking devices on any of them ("You have to check all the vehicles to see if they are being monitored."). CASTRO said he

had already asked someone to check ("No way. Juan Carlos checked the SUV a few days ago."). CASTRO repeated that he thought the break in was planned by someone who knew money was hidden inside ("But what I am telling you. That SUV . . . whoever . . . knew what it was . . . it's used.").

### CASTRO asked BOBBY to prepare a kilogram of fentanyl for CASTILLO

74.     On October 31, 2020, at 2:30 p.m. (call #1175), CASTRO used Target Telephone #14 to call BOBBY. CASTRO told BOBBY that CASTILLO had called and said he was going to visit BOBBY with a person named Francis ("Fermin called me, that maybe they will stop by today if not tomorrow himself or Francis the [unintelligible]. Do you know who is Francis?"). BOBBY asked about Francis ("Who is that, the one of the [unintellible]?"). CASTRO said he did not know who Francis was, and told BOBBY to prepare a kilogram of fentanyl, which he referred to as 'abajo' ("No, I don't know. That is what he said. So, you have the title ready of the thing of the abajo, because Carlos said that he thinks that the people next door went in."). BOBBY said he had not been to the location where the fentanyl was stored ("Alright, I have never been there, but those people [unintelligible]. Alright, alright."). CASTRO told BOBBY to have the drugs ready so CASTILLO and Francis could examine them ("So, just have it handy for him so he can see/measure what's happening. They can take it or do whatever . . . on my behalf."). BOBBY agreed ("Alright.").

### CASTRO told BOBBY about the seizure from HERAUX.

75.     On January 9, 2021, at 9:14 a.m. (call #827), BOBBY (using (809) 969-4462) called Target Telephone #15 and spoke to CASTRO. CASTRO told BOBBY about the seizure from HERAUX ("Damn my man! I got another big hit yesterday. Once again."). BOBBY asked what had happened ("Damn and what's going on? To complicate more things."). CASTRO said

that HERAUX was stopped while en route to deliver the money to someone ("I don't know man! It was some money that had to be paid, and when the girl was on her way to bring it . . . You know what happened."). BOBBY asked if it was seized from the same person who always delivered money ("And she's the one who always brings it?"), and CASTRO affirmed ("Yes."). CASTRO acknowledged seizures were part of the risk of drug trafficking, but said the seizure hurt his business because the money was being delivered to pay an existing drug debt ("That's part of the routine, but it hurts because it was something that belongs to another person . . . in order to resolve. You know what I mean?").

## 2. *CASTRO-CINDY-YING*

CASTRO arranged to deliver $100,000 to an Asian money launderer.

76.     On October 21, 2020, beginning at 11:00 a.m., CASTRO (using Target Telephone #13) and CINDY (using (781) 658-0360) exchanged a series of text messages. At 1:01 p.m., CASTRO sent a text message to CINDY which read, "Hello Cindy." At 1:05 p.m., CASTRO sent a serial number via a text message to CINDY ("E19360351c"). CINDY replied via text, "How much." CASTRO replied, "100," meaning $100,000.  CINDY replied, "You send it to me."

77.     After this last text message, CINDY called Target Telephone #13 and spoke to CASTRO. CINDY asked if CASTRO spoke Spanish ("Hello. Do you speak Spanish?"), and CASTRO affirmed ("Yes. Tell me."). CINDY confirmed that CASTRO was going to be sending money to her ("You will bring it to me, right?"), and CASTRO affirmed ("Yes, that's correct!"). CINDY confirmed that CASTRO was delivering $100,000 ("Okay. Are you bringing 100?"), and CASTRO affirmed ("Yes"). CINDY asked if CASTRO would be delivering the money that day or the following ("Okay . . .You bring it today or early tomorrow?"). CASTRO said CINDY should decide ("You are the one who knows. If you want, it can be right now."). CINDY said she

would send an address for the delivery ("Listen! I will send you the address, and you check it, and you let me know at what time you will arrive."). CASTRO said that he thought he would be delivering the money to an address in Boston that he provided ("Oh, but the Lady told me that I should send the address from here, from Boston."). CINDY said she was told CASTRO would be delivering to her ("But my boss is telling me that you bring it to me."). CASTRO again said he usually picked the address for the money drop ("Yes, that's right. I will bring it to you. But I will send you the address."). CINDY again said she would pick the address ("But how are you saying that you will bring it to me. That's why I'm the one sending you the address, and you bring it to me, right?"). CINDY again said she would send CASTRO an address ("Listen! First I will send you the address and let me know if you can or if you can't do it. Okay?"). CASTRO agreed. After the call, CINDY sent a text message to Target Telephone #13 with the address  ("100 exchange st malden ma 02148."). The call between CASTRO and CINDY was in Spanish. The Spanish linguists who are monitoring the calls believe from CINDY's accent that she is Asian but speaks with a Mexican accent and dialect.

78.     In a call later that same day at 2:45 p.m., CINDY called Target Telephone #13 and spoke to CASTRO. CINDY explained that the money drop had to be postponed until Friday, October 23, 2020, because the courier who would be picking up the money was not available until then ("I'm sorry sir. There's no people to pick that up today. For Friday, because the guy is not there. There's no people working."). CASTRO agreed and asked for a time on Friday ("Okay, so by Friday? . . . to the address you said? . . . around 10:00 or 11:00?"). CINDY agreed, ("10:00 or 11:00 in the morning.").

79.     On Thursday, October 22, 2020, at 9:24 a.m. (call #282), CASTRO called CINDY to confirm the time of their meeting the following day. CINDY told CASTRO to choose a time

("Tomorrow you choose the time at 10:00 or 11:00 but confirm if it's at 10:00 or 11:00 or what time are bringing it?"). CASTRO said he would call at 10:00. CINDY affirmed that CASTRO would be delivering the money to the address she had provided ("Yes, at 10:00 there at the address."). CASTRO said he would be delivering the money to the address at 10:30 ("Okay. So it's like I'm saying, I'll be arriving to the address you told me at 10:30.").

80.     On October 23, 2020, at 10:11 a.m. (call #283), CASTRO called CINDY to tell her that a courier was arriving with the money. CASTRO said, "In 35 minutes." CINDY acknowledged ("Okay. Half hour.").  At 11:11 a.m. (call #301), CINDY called CASTRO and asked if CASTRO could see "a guy with a black shirt and black pants there." CASTRO was heard asking someone, "Can you see a guy with a black shirt and black pants?" CASTRO told CINDY to send the person back outside ("Call him and tell him to come back. Tell him to come out again and come back."). CINDY again asked what type of car CASTRO was driving ("But what's your car?"). CASTRO explained that he was in an Uber car but the courier had gone back inside the building ("I'm in an Uber. I already saw him, but he went inside. Tell him to come back. I'm here."). CINDY said that the courier had been waiting for half an hour for CASTRO ("Yes, he waited there for half hour and you did not arrive."). CASTRO said he had been there for a while and asked that the courier come back outside ("I'm here for quite a while. I'm here parked. Tell him to move so I can see him again. Because I did not know it was him."). CINDY said the courier wanted to know what car CASTRO was driving ("He's asking what car are you driving."). CASTRO said he was now on foot because the Uber car had left. ("I came in an Uber. I'm on foot . . . I don't have a vehicle. The Uber left. I'm here at the parking lot . . . Here at the parking at the address you sent me."). CASTRO then told CINDY he was with the courier ("Okay. I saw him. I saw him already. He's here. The guy is here.").

81.     Based on the intercepted calls, on the morning of October 23, investigators established surveillance in the vicinity of 79 Poplar Street. At approximately 10:04 a.m., HERAUX exited 79 Poplar Street and got into the front passenger seat of the Crosstour. A few minutes later, CARMONA appeared on foot and got into the driver's seat of the Crosstour. HERAUX then got out of the vehicle and walked to the rear parking lot of 79 Poplar Street. Investigators followed CARMONA in the Crosstour as he drove away. CARMONA arrived in the area of 200 Exchange Street in Malden at approximately 10:44 a.m. He remained at that location for a few minutes and then drove the Crosstour to and parked across from 100 Exchange Street. At approximately 11:00 a.m., an investigator observed an Asian male, later identified as YING,[2] wearing black shorts and a black shirt sitting on a bench near 100 Exchange Street. Investigators saw YING enter in and exit out of the rear door of 160 Pleasant Street (Target Location #9) a few times. 160 Pleasant Street is a residential building across the street from 100 Exchange Street. At 11:13 a.m., investigators saw YING walk towards CARMONA, who was standing outside the Crosstour. CARMONA was talking on a cell phone as YING approached him, and CARMONA motioned for YING to get into the Crosstour. CARMONA and YING drove away in the Crosstour and then returned to Pleasant Street. YING got out of the Crosstour carrying a tan bag and reentered 160 Pleasant Street. The Crosstour departed and returned to 79 Poplar Street. Based on the intercepted calls, I believe CASTRO sent CARMONA to deliver the $100,000 to CINDY's courier, YING; that CASTRO passed along the description of YING ("black shirt and black pants") to CARMONA prior to CARMONA arriving at 100 Exchange Street; that YING was sent by CINDY to pick up the money; and that the tan bag that YING was

---

[2] YING is a Chinese national here in the United States on a student visa. He attends Northeastern University in Boston, Massachusetts.

carrying when he got out of the Crosstour contained the $100,000 that CASTRO delivered to CINDY for the purposes of laundering drug proceeds.

<u>YING's financial records are suspicious and indicative of money laundering.</u>

82.     A review of YING's historical account records for the various financial accounts identified revealed that YING has a history of unusual cash deposit activity, specifically that he has irregular, but significant, often round dollar cash deposits. For example, during a period between March and April 2019, YING conducted a series of nine separate cash payments totaling $28,546 that he conducted in-store at Saks Fifth Avenue in Boston.  These cash payments applied to YING's Saks Fifth Avenue credit card account were then followed by several merchandise returns, which ultimately resulted in YING having a credit balance in excess of $21,000. The credit balance was then refunded to YING via a manual check issued by Capital One, the issuing financial institution of the Saks Fifth Avenue retail credit card, which YING deposited into his Bank of America account. By making the excessive cash payments to Saks, and forcing a large credit balance via returns, YING was effectively able to utilize Saks Fifth Avenue to convert, and thereby conceal, the cash activity from YING's primary banking relationship with Bank of America.

83.     Between July 2019 and March 2021, YING made several large cash transactions into his personal accounts held with JPMorgan Chase and Bank of America, which collectively totaled more than $350,000. In YING's Bank of America *6653 account, YING made a cash deposit of $40,000 on July 13, 2020 at a branch located in Malden, Massachusetts. On the same day of the cash deposit, YING conducted an outgoing wire transfer for $23,190 to a business account held by Security Life of Denver Insurance Co., referencing a policy held by Chuanbao Zha. Any potential relationship between YING and Zha is unknown at this time. Subsequently,

on January 14, 2021, YING made a cash deposit of $30,000 into his Bank of America *6653 account at a branch located in Arlington, Massachusetts. Records for YING's account were only obtained through January 19, 2021, at which time the $30,000 still remained in the account.

84.     Records for YING's JPMorgan Chase *3066 account were reviewed from August 2019 through January 2021. During that time, there were cash deposits of $13,860 on July 25, 2019; $6,000 on August 22, 2019; $8,000 on September 26, 2019; $9,000 on October 25, 2019; and $1,500 on October 13, 2020. In addition, based on a recently filed Currency Transaction Report ("CTR"), YING made a cash deposit of $150,000 on March 11, 2021, at a branch located on Kneeland Street in Boston, Massachusetts.

85.     In addition to YING's checking account, records were also reviewed for YING's credit card account held at JPMorgan Chase. Between August 2019 and November 2020, YING incurred credit card purchases totaling $134,737 and made payments toward the account balance totaling $137,347, of which $99,880 were in the form of cash payments. While most of the cash payments were conducted in Massachusetts, one of the cash payments conducted on February 26, 2020 for $16,500 was made by YING in Flushing, New York. A review of the charge activity incurred by YING revealed that YING has made numerous trips to New York, as well as Los Angeles. Based on location data for CINDY's phone, CINDY was located in Los Angeles at the time she was intercepted over CASTRO's phone directing CASTRO to YING at 160 Pleasant Street.

86.     In addition to the significant cash activity conducted by YING in his accounts, YING has also engaged in voluminous peer-to-peer ("P2P") transactions with several different individuals. Between YING's Bank of America account and his JPMorgan Chase account,

reviewed for approximately a year and a half, YING had incoming P2P transfers totaling over $300,000 and outgoing P2P transfers totaling just under $250,000.

87.     In the last four months, YING has had approximately $200,000 in cash transactions, including a $20,000 payment to his JPMorgan credit card on December 14, 2020; a $30,000 cash deposit into his Bank of America account on January 14, 2021; and the $150,000 cash deposit into his JPMorgan account on March 11, 2021. Since the October 23, 2020 pickup of $100,000, YING has continued to demonstrate access to a large amount of cash, as evidenced by the numerous, large round dollar cash deposits made into his bank accounts or applied to his credit card accounts.  YING has also demonstrated that he maintains a significant network of individuals with whom he transfers funds on a regular basis. The cash transactions and the multitude of P2P transfers are suspicious in their own right, but coupled with the fact that YING appears to travel frequently and is a college student with no known source of income, there is reason to believe that YING's financial dealings are illegal in nature.

### 3.  CASTRO-HERAUX-CARMONA

88.     As detailed herein, HERAUX and CARMONA are CASTRO's main drug and money couriers. HERAUX has been intercepted over CASTRO's phones discussing the delivery or drugs and collection of drug proceeds. To my knowledge, CARMONA has not been intercepted during this investigation. Intercepted calls indicate that CASTRO, CASTILLO, HERAUX, and CARMONA mostly communicate over the encrypted phone application WhatsApp, which explains the limited intercepted calls between CASTRO, HERAUX, and CASTILLO and no calls between CASTRO and CARMONA. As detailed above, investigators seized $150,000 from HERAUX on January 8, 2021, which I believe were drug proceeds belonging to CASTRO and CASTILLO. As further detailed above, on February 26, 2021, investigators seized approximately

225 grams of suspected fentanyl from HERAUX as he was en route to deliver those drugs to a customer of CASTRO's. HERAUX has also delivered drug proceeds on at least four other occasions during the course of this investigation. CARMONA delivered the fentanyl to GUERRERO on March 16, 2021, and also delivered drug proceeds to SONGFENG and YING, and to UCs during this investigation. As detailed above, the drug proceeds CARMONA delivered to a UC on December 10, 2020, were on behalf of CASTILLO.

<u>CASTRO sent HERAUX to deliver drugs to a customer.</u>

89.     On October 14, 2020, at 5:46 p.m. (call #131), CASTRO received an incoming call from a phone with a New York area code ((646) 249-6079) and spoke with an unidentified male ("UM6079"). The call was intercepted over Target Telephone #13. CASTRO told UM6079 that couriers were on their way to meet with UM6079 ("They are already on their way, man... They are already on their way."). UM6079 said he was changing the meeting location because of law enforcement presence in the area and would send an updated address ("I am going to give you another address because . . . It's hot over there."). UM6079 asked if he could send the new address via text message and CASTRO agreed. After the call ended, UM6079 sent the address to CASTRO over Target Telephone #13 ("40 locke st Haverhill ma 01830."). Based on prior intercepted calls, I believe CASTRO was sending a courier to deliver drugs to UM6079.

90.     At 6:43 p.m., the GPS device on the Honda Pilot indicated it was at 800 Hyde Park Avenue, and investigators on scene saw that it was parked in the rear of 800 Hyde Park Avenue. At approximately 6:55 p.m., investigators followed the Honda Pilot as it departed 800 Hyde Park Avenue. Investigators observed that HERAUX was driving the Honda Pilot, and followed it to 40 Locke Street in Haverhill.

91.     Later that evening at 6:48 p.m. (call #142), UM6079 called Target Telephone #13 and spoke to CASTRO. CASTRO told UM6079 that the courier was en route ("He is on his way. You know that I live far away. I don't live there."). UM6079 asked if the person making the delivery had already left ("Oh, is the guy who is coming? . . . Did he leave a while ago?"). CASTRO said the courier had left Boston ("B") and would be in Haverhill in approximately 40 minutes ("He should already be . . . He already passed the "B." He will be there in like 40 minutes."). Later that evening, at 7:55 p.m., CASTRO called UM6079 to tell him that the courier had arrived ("He is downstairs. Right there where you said.").

92.     At 7:50 p.m., the Honda Pilot arrived and parked in the vicinity of 40 Locke Street. A Hispanic male exited 40 Locke Street and got into the Honda Pilot. The Honda Pilot departed the location and then returned minutes later. The Hispanic male got out of the vehicle and reentered to 40 Locke Street. Based on the intercepted calls and my training and experience, I believe the Hispanic male who got into the Honda Pilot was UM6079 and that HERAUX delivered drugs to UM6079 on behalf of CASTRO.

93.     Approximately 15 minutes later, at 8:05 p.m. (call #146), CASTRO received an incoming call UM6079, and spoke with an unidentified male ("UM6079"). UM6079 told CASTRO that he had received the drugs that CASTRO had sent ("I already saw him, alright?"). CASTRO was grateful ("Thank God."). UM6079 asked about the quality of drugs (believed to be fentanyl) that CASTRO was selling ("How is that rice?"). CASTRO said he had not received any complaints about the quality of the fentanyl in either Massachusetts or in New York ("Well, on this side and on your side it hasn't had any complaints . . . Just so you know. Check it, but I haven't had any complaints there."). UM6079 said he had a customer who wanted to purchase fentanyl and was wondering how much cut he could add to the drugs before selling them ("Alright.

I will do, because there is a friend of mine that I, you know, I give little things to him. But I also add it something."). CASTRO explained how UM6079 should dilute the drugs ("No, so what you need to do is to take out a little something 20, 30, I don't know how much, 100. Whatever you want to take out. Add whatever you will."). UM6079 interrupted, saying his customer wanted 200 grams ("He wants, he wants, he wants 2. He wants me to give him 200. And I want to give him this one, because he wants it with, he wants it of this color."). CASTRO assured UM6079 the fentanyl was high quality and could be diluted so UM6079 could increase his profit ("No, I know that is number 1 A."). UM6079 asked if he could add 50 grams of cut to the 200 grams ("Yes, what I want to say is. For example, if take those 200, could I add it 50 easily?"). CASTRO agreed that he could add 50 grams of cut and that the drugs would still be potent ("Yes, add 50 to it . . . he can't give you a complaint, not at all."). UM6079 agreed, ("Alright, my brother, alright.").

### HERAUX delivered $64,000 to a Mexican drug courier.

94.     On October 28, 2020, CASTRO (using Target Telephone #13) exchanged a series of calls and text messages with VALDEZ, a Mexican national, who was using phone number (347) 852-4134. The 347 area code is assigned to New York-based cell phones. Based on the intercepted calls, investigators believed that VALDEZ traveled from New York to Boston to pick up $64,000 in drug proceeds from CASTRO, which HERAUX delivered.

95.     At 10:07 a.m. (call #400), VALDEZ called CASTRO to say he was heading to Boston and asked CASTRO to send him a location to meet ("You let me know where."). At 2:22 p.m., CASTRO used Target Telephone #14 to call HERAUX. HERAUX told CASTRO he had already met with someone else ("Yes, I saw him."). CASTRO said he was sending someone to meet with HERAUX ("I've been calling you. In a couple. He's about to go up . . . He's there already."). At the time of this call, the location data for Target Telephone #13 indicated it was in

the vicinity of 176 Brook Road (Target Location #1). Based on the following detailed calls and surveillance observations, I believe that CASTRO sent someone to meet with HERAUX to give HERAUX the money that VALDEZ was traveling to Boston to collect.

96.    At 2:24 p.m., CASTRO called VALDEZ and asked if he should send an address ("Should I send you the address?"). VALDEZ affirmed ("I will let you know, and you can give me the location."). At 2:53 p.m., VALDEZ called CASTRO and asked for an address. VALDEZ told CASTRO he was taking a taxi to the location. CASTRO then sent a text message to VALDEZ with an address near the La Bamba Market ("4 lorne st 02124 Dorchester.").

97.    At 3:46 p.m., VALDEZ called CASTRO to say he had arrived at "La Bamba." CASTRO told him to go inside the store and he would "call the girl." At 3:46 p.m., I observed a Hispanic male, believed to be VALDEZ get out of a taxi and meet with three Hispanic males outside of La Bamba Market. The Hispanic male believed to be VALDEZ then walked towards and entered La Bamba Market.

98.    At 3:37 p.m., CASTRO called VALDEZ and said that a guy was coming out to deliver two bags containing $64,000 to VALDEZ ("Yes, the guy is coming out now to give you the bag. There are two bags with 32 each, so there are 64. Send me the picture, the picture or give the picture to him."). CASTRO asked if VALDEZ could see the courier ("Can you see the guy? Did you see him?"). VALDEZ affirmed ("I can see him now. I see him.").

99.    At 3:53 p.m., the location data for HERAUX's phone indicated it was in the vicinity of La Bamba Market. At 3:55 p.m., investigators observed a male driving the Crosstour leaving the area of La Bamba Market. Based on the precise location data, intercepted calls, and surveillance observations, I believe HERAUX used the Crosstour to deliver $64,000 to VALDEZ, and that the money was drug proceeds.

100.    Investigators followed VALDEZ after he left La Bamba Market. VALDEZ, carrying a large green backpack, got into the rear passenger seat of a white Honda Civic, and left the location. Investigators followed VALDEZ to a hotel located in Boston. According to the hotel, VALDEZ checked into the hotel at 5:04 p.m. on October 28, 2020, and checked out of the room sometime during the night of October 28.

### 4. CASTRO-GUERRERO

101.    GUERRERO has been intercepted over Target Telephones #12, #13,  #14, and #15 arranging to purchase drugs from and drop off drug proceeds with CASTRO. GUERRERO has been intercepted using three different numbers: (617) 652-1062 (the 1062 Phone); (857) 234-7650 (the 7650 Phone); and most recently, Target Telephone #19, all in furtherance of the Target Offenses.

GUERRERO ordered drugs from CASTRO.

102.    On August 11, 2020, at 9:09 p.m. (call #322), CASTRO received an incoming call from GUERRERO, who was using (617) 652-1062.[3] CASTRO asked, "Tell me, Comandante! How's everything?" GUERRERO told CASTRO he needed to meet with him ("Listen, I think that we have to see each other next week. The next weekend, you hear?"). CASTRO said he was available ("Whenever you want. I'm active for you all the time."). GUERRERO said that he wanted his usual order of a half kilogram ("The same, a half, you hear?"). CASTRO acknowledged ("No more to talk about . . . Alright, it's an order.").

---

[3] In 2018, GUERRERO was intercepted over a state wiretap using this phone to purchase large quantities of drugs from CASTRO. Neither CASTRO nor GUERRERO were identified prior to the conclusion of that investigation, and thus were not arrested at that time.

CASTRO arranged to pick up drug proceeds from GUERRERO.

103.     On October 24, 2020, at 3:14 p.m. (call #334), GUERRERO called CASTRO. The call was intercepted over Target Telephone #13. CASTRO asked if GUERRERO was at a business ("Are you at the business?"). GUERRERO explained he was not there ("Buddy! To be honest I am . . . I'm running an errand buddy!"). CASTRO said that was fine ("No worries. Take it easy."). GUERRERO explained that he was with someone who tested positive for Covid and was planning to get tested ("I have weird symptoms, and I was next to someone that got positive. You know?"). CASTRO told GUERRERO to "take care," and GUERRERO asked if CASTRO could wait to collect the money GUERRERO owed ("But let me know if you can wait until I do that test, because I don't want to . . . I can give you the money, but I'm telling you what's going on."). CASTRO agreed he could collect the money at a later time ("It's okay. I thought you were at the business. I'm around the barbershop, but it's okay. No worries.").

104.     On October 27, 2020, investigators intercepted calls over Target Telephone #13 between GUERRERO and CASTRO which indicated that GUERRERO was delivering drug proceeds to CASTRO. During the calls, CASTRO directed GUERRERO to bring the proceeds to La Bamba Market ("the "bodega."). GUERRERO gave a description of the vehicle he was driving during a call, which allowed investigators to identify him when he dropped off the money to a person inside of La Bamba Market.

GUERRERO and CASTRO discussed a prior drug purchase and arranged for GUERRERO to obtain additional drugs from CASTRO, which were supplied by CASTILLO.

105.     On December 23, 2020, at 6:04 p.m. (call #323), GUERRERO used Target Telephone #19 to call CASTRO. The lengthy call was intercepted over Target Telephone #15. GUERRERO told CASTRO that he had a reliable drug customer who wanted to purchase high quality drugs ("You know that this man gets rid of that quick, you follow? But it has to be

something really good."), and that the customer did not like the quality of the drugs GUERRERO had already sold him, which GUERRERO had purchased from CASTRO ("It looks like this trip is not working for him."). CASTRO was surprised because no other customers had complained about the quality of the drugs ("Really? Nobody had any complaints."). GUERRERO said that the customer had previously bought drugs twice a week but was now only buying once a week ("So you know, man. This trip didn't work for him. He called me earlier. I was noticing because he was coming twice a week. So, I've been noticing that he is coming just once, and I am like, 'Oh oh.'"). GUERRERO explained that the customer had bought half a kilogram and wanted to purchase more drugs, but only if they were stronger because his customers were complaining about the prior drugs ("But he already got rid of almost half. You follow? So, I have half there still. And he called me and asked me if I could get him something better because 'that' is moving very slow for him. You follow?").

106.   CASTRO offered to give GUERRERO better drugs which could be mixed with remaining half kilogram to make it stronger ("Yeah, I will be honest, I can get you something else and you can fix it to him on the go. Because to be honest, I don't have any more of the same that you have, you follow?"). CASTRO claimed to have drugs which his customers reported were high-quality ("But I have something that is great. Everybody is happy with it."). GUERRERO asked if CASTRO would exchange the old drugs with his new drugs ("And could you change it for me?"). GUERRERO complained that he did not want to fall further into debt with CASTRO ("If I take that I will get even more into debt."). CASTRO said he would give GUERRERO drugs that were much higher quality to fix the prior batch and that he would not pressure GUERRERO for payment because GUERRERO was a long-standing customer ("No, because I am going to give you something good, better. I am talking about something way better. Way better. So, you

can be adding it. You follow? . . . And both are going to be gone. Don't worry that you will be paying me. I won't be pressuring you because you are telling me what is going on. And even then I have never pressured you, you know?"). CASTRO explained that he had already paid for the drugs ("I already paid that to its owner") and that CASTILLO (who CASTRO referred to as "El Loco") had supplied the drugs ("I am working with somebody else, and with El Loco because Loco is participating there, you follow? . . . because El Loco was around here, and we are . . . You already know."). CASTRO again said the drugs he would give GUERRERO were potent ("What I am going to send you is in a certain potency."). GUERRERO interrupted, saying his customer was coming back the next day to purchase more drugs ("He is coming in the morning, that is the problem.").

107.    CASTRO assured GUERRERO that the new drugs he had on hand were so strong that GUERRERO could dilute the bad drugs to make them stronger and sell them to other customers at a profit ("Alright, let me tell you. If the man calls you for 20 pesos. For example, you can add 10 or 15 of what I am giving you now and 5 of the other . . . And that is going to pass for you great."). GUERRERO asked if he should just mix the remaining bad drugs with the new drugs ("Okay. And if I just take everything out and mix everything and I take it out little by little? Wouldn't that be better?"). CASTRO suggested that GUERRERO mix smaller amounts from the two batches to create a sample ("Could be, but I was saying it so you could make a test/sample."). CASTRO asked what quantity the customer wanted to purchase the following day ("How much are you going to give him tomorrow?"), and GUERRERO replied 200 grams ("200."). CASTRO said he would give GUERRERO 250 grams ("Oh, you are going to give him 200. So, I will give you 2 and a half today."). CASTRO explained in detail how GUERRERO should mix the drugs ("So what you are going to do is you are going to take 100 of what I am going to send you and

take 100 of the other. Or take 150 of what I am going to send you and 50 of what you have there . . . And once it passes then you'll know there is no problem. But what I have is a bomb."). GUERRERO again expressed concern about having to pay CASTRO for new drugs to fix the old drugs that he had already purchased and could not sell because of their low quality and that selling bad drugs was bad for business ("Okay, but how much will I owe you then? That's what I am trying to say . . . 'This' has been weak . . . I don't want you to lose, but I don't want to lose either . . . because if I slow down, you'll slow down too. And this guy will slow down as well. The three of us will slow down."). CASTRO agreed ("The three of us will slow down."). GUERRERO said he did not want to slow down his drug trafficking business ("So I don't want him to slow down so I don't slow down with you either. Because I am on track, and you are too."). CASTRO asked how much GUERRERO wanted him to reduce the price by ("Exactly . . . How much do you want me to discount for you?"). GUERRERO hesitated, saying he planned to buy a lot more drugs because he had a lot of customers ("No, no. Not me . . . You tell me . . . Because I am going to take more having a lot of 'work' here."). CASTRO said he would reduce the price per kilogram to $40,000 and take the loss for GUERRERO ("Alright. Listen to what I am going to do. I am going to lose my numbers [profit]. So you don't lose. I am going to give it to you at 40. That is how I grab it. But in that case, I lost my profit, but you keep the costumer."). GUERRERO agreed ("Okay, yes.").

108.    GUERRERO told CASTRO he had already paid him $15,000 for the drugs and still owed him $10,000 ("So from this I already paid you 15, I owe you 10."). CASTRO agreed ("Exactly."). GUERRERO asked when CASTRO could deliver the drugs ("Alright, it's fine and when can you send it to me? Can you send it to me today?"). CASTRO told GUERRERO to hold on ("Let me, hold on. Hold on there."). GUERRERO offered to call back ("Find out and call me

back."), and CASTRO again told him to wait ("No, hold on."). There was silence, and then CASTRO confirmed that GUERRERO had already paid him $15,000 and needed to give him an additional $5,000 for the new drugs ("Okay, buddy. From this you already gave me 15. You just need to give me 5,000. 5 pesos more and we leave it like that . . . Because I am giving it to you at 40."). GUERRERO agreed ("Alright, that's fine."). CASTRO reminded GUERRERO he was losing his profit to supply GUERRERO with better drugs so GUERRERO would not lose his customer ("I am the one who is not making any profit, but you don't lose it, and you don't lose the man.").

109.    CASTRO asked if GUERRERO wanted to pick up the drugs that same day ("Do you want the guy to meet you today?"). GUERRERO affirmed ("If possible because he is coming tomorrow morning. He comes before 9:00."). CASTRO agreed and offered to deliver the drugs near GUERRERO's grandmother's house ("Okay. So, it's 6:00. What do you think around 8:00 by your grandmother's? So we don't mention Santo."). GUERRERO asked if CASTRO could deliver the drugs closer to South Bay ("Damn. Can't you come down, this way to South Bay?"). CASTRO said his courier ("guy") did not like to deliver in that area ("The thing is that my guy doesn't like that area because he, you know what he has there, you can live in that area because you are who you are."). GUERRERO said he did not want to have to drive a long distance carrying drugs ("My problem is going up there and then come back down with that . . . The thing is me going over there to Dorchester and then come back with that from there to here."). CASTRO agreed ("Okay.").

110.    They continued to discuss an alternate location for GUERRERO to receive the drugs. GUERRERO and CASTRO what time the La Bamba Market closed ("What time do they close the convenience store?"), and CASTRO replied, "At 10:00." GUERRERO asked if they

could meet at the "Stop and Shop on Blue Hill." CASTRO declined, saying his courier did not like to go to those locations either because law enforcement had seized drugs three times from his couriers at that location ("You know what I don't like that buddy? Because I have already had three failures in the plaza."). GUERRERO agreed to meet at the convenience store ("I'll go to the convenience store."). CASTRO asked if GUERRERO could meet at 7:00 ("Do you want to meet him at 7:00 there?"). GUERRERO agreed.

111.    CASTRO told GUERRERO that the drugs he was selling him came directly from CASTILLO ("This work that I am going to send you, it's not mine. It's Fermin's work you follow? I like being straight forward . . . because he came... he was here and he told me, 'I know that you are taking care of Guerrerito. I am not dumb,' and I didn't lie to him, because that is not good."). GUERRERO agreed ("Same as me, same as me."). CASTRO said he did not lie because he was not sure if CASTILLO had talked directly to GUERRERO ("I didn't lie to him, you know? Because I don't know if he has talked to you or something."). GUERRERO told CASTRO he was loyal ("No, buddy. I don't betray you, forget it . . . With that man, I have only talked to him in front of you. I have never, I have never."). CASTRO explained that CASTILLO was his relative ("No, because I am telling you, he is my brother, my family."). GUERRERO agreed ("I know, I know."). CASTRO again mentioned that CASTILLO had been in Massachusetts ("But it is how I told you Guerrerito, he is around there, and I am around here and if he has something that is not good . . ."). GUERRERO interrupted, saying he would not betray CASTRO's confidences ("No, buddy don't worry. Whatever you talk to me, don't worry, it's just with me."). GUERRERO again told CASTRO he would be at the convenience store at 7:00 and would bring CASTRO $5,000 the following morning after he met with his customer ("Yes, don't worry. I will be at the

convenience store at 7:00 . . . This guy is coming early, so I will give you the 5 at Washington or Warren.").

HERAUX delivered drugs to GUERRERO on behalf of CASTRO.

112.    On December 23, 2020, at 6:27 p.m., CASTRO (using Target Telephone #15) called Target Telephone #19 to tell GUERRERO his courier had left ("You can go there because the guy left."). GUERRERO said he was leaving. At 6:44 p.m., the location data for HERAUX's phone (Target Telephone #18) indicated it was in the vicinity of 800 Hyde Park Avenue. At 6:47 p.m. that same day, GUERRERO used Target Telephone #19 to call CASTRO over Target Telephone #15 (call #327). GUERRERO told CASTRO he was "parked at the convenience store" in his new vehicle ("I changed my SUV. It is a white Highlander now."). CASTRO said he was sending someone to meet with GUERRERO ("That's fine. Let me tell him."). At 7:14 p.m., the location data for Target Telephone #18 indicated it was in the location of the La Bamba Market. Based on the intercepted calls, I believe HERAUX went to 800 Hyde Park Avenue to pick up drugs and then delivered those drugs to GUERRERO at the La Bamba Market.

GUERRERO used Target Telephone #19 to arrange to deliver drug proceeds to CASTRO.

113.    On January 9, 2021, at 4:01 p.m. (call #834), GUERRERO used Target Telephone #19 to call Target Telephone #15 and speak to CASTRO. GUERRERO told CASTRO he had money to give to him ("I have the prescription") and asked where he should bring the money ("You tell me where should I drop it off? If I should do it at the pharmacy or by Washington."). CASTRO told GUERRERO to call him when he left and they would decide on a location ("When you are ready to head out of the house let me know, and we can meet by the pharmacy, the one on Washington."). CASTRO clarified it would be near the place where he gets haircuts ("Right there, where I get a haircut."), and GUERRERO agreed ("Alright"). Investigators have seen

CASTRO at the Rodriguez Barber Shop, located 293 Washington Street in Dorchester, on numerous times during this investigation.

114.    At 4:40 p.m. that same day, the phone location data for Target Telephones #15 and #18 indicated that both phones were at El Rincon (Target Location #5). At 4:45 p.m., GUERRERO again used Target Telephone #19 to call Target Telephone #15 and told CASTRO he was heading to the barbershop ("My man, I about to head out there . . . I'll be there like in 10."). CASTRO said that HERAUX was heading there to meet GUERRERO ("Alright, the nephew is on his way there right now . . . He'll be there in 10 as well.").

115.    At approximately 4:47 p.m., the GPS tracking device on the Crosstour indicated it was leaving El Rincon (Target Location #5). At approximately 5:02 p.m., the GPS affixed to the Crosstour indicated it was in close proximity to the Rodriguez Barber Shop.

116.    At 5:04 p.m., GUERRERO (using Target Telephone #19) sent a text message informing CASTRO (using Target Telephone #15) he had arrived ("I'm here."). CASTRO acknowledged by text ("Ok."). GUERRERO replied back by text that he had sent $5,000 and that he owed CASTRO $7,500 ("Sent 5 we are at 7.5"). CASTRO agreed ("Ok."). At 5:11 p.m., the location data for HERAUX's phone (Target Telephone #18) indicated it was in close proximity to the Rodriguez Barber Shop as well.

117.    At approximately 5:42 p.m., the GPS affixed to the Crosstour indicated that the vehicle traveled from the area of the Rodriguez Barber shop to 176 Brook Road (Target Location #1). At approximately 5:45 p.m., the location data for Target Telephones #15 and #18 indicated both devices were in the area of 176 Brook Road. I believe HERAUX picked up $5,000 from GUERRERO and brought the money to CASTRO at his residence (Target Location #1).

GUERRERO used Target Telephone #19 to talk to his drug customers.

118.    On February 19, 2021, at 10:41 a.m. (call #6), GUERRERO used Target Telephone #19 to call (508) 364-8221 and speak to an unidentified male who is believed to be a drug customer ("UM8221"). GUERRERO, who was in the Dominican Republic, asked UM8221 if the drugs that UM8221 had purchased were acceptable ("The work condition is good?"). UM8221 replied that he had not tested the drugs yet ("I'll let you know later today cause I just opened it today."). UM8221 said he thought the drugs would be fine ("I think it should be fine, but I'll let you know. I'll call you later."). GUERRERO said the drugs were the same as the drugs UM8221 had previously purchased ("It's the same."). UM8221 replied that they looked fine ("Okay. It should be. It looks good, everything.").

119.    On February 19, 2021, at 11:30 a.m. (call #9), GUERRERO used Target Telephone #19 to call (617) 331-1291 to talk to an unknown male who is believed to be a drug customer ("UM1291"). During the call, GUERRERO said he was sending the mother of his child instead of his wife to deliver drugs to and pick up a drug debt from UM1291 ("Listen I'm going to send the mother of my other girl to go to the house to pick it up and bring it to you, because my wife can't go out."). UM1291 agreed ("It's okay. I will be around here, my brother. No problem."). GUERRERO asked if he should send UM1291 500 grams more of drugs ("Do you want me to send you five more?"). UM1291 asked to "wait at least this week" before he purchased more drugs. GUERRERO said he needed UM1291 to wire him the money UM1291 owed to the Dominican Republic ("No, but for you to hand it to me here."). UM1291 asked if he could send the money to GUERRERO in a week, and GUERRERO said he needed it sooner because he was leaving the Dominican Republic the following week ("The thing is that I'm leaving next Monday . . . I need it fast."). GUERRERO said he would send UM1291 300 grams of drugs ("See what you can do. Instead of giving you 250 I will give you 300."). UM1291 said he needed to check

with his customer to see if UM1291 could collect the money, which he would then send to GUERRERO ("Let's see . . . I can give you a solid answer, but a little bit later. I have to call over there and see how things are and check if I can get it."). GUERRERO again said he would send his ex-wife to pick up the money and deliver more drugs ("Okay, no problem! Let me know so I can send my ex-wife to go and pick it up and pay for the other right away."). UM1291 agreed ("No problem. It's okay. I will let you know right away. A little bit later. No problem.").

120.    On March 4, 2021, at 8:14 a.m. (call #137), GUERRERO received an incoming call from a drug customer, JOE, who was using (781) 664-7643. GUERRERO asked what type of drugs JOE wanted ("What you need?"). JOE replied that he wanted to purchase cocaine ("white") and heroin/fentanyl ("brown") ("You have white and brown? Or just brown? I was thinking 40 brown and 40 white, but if not 80 brown."). GUERRERO said he was out of cocaine ("No white"), and JOE replied he wanted "80" of the heroin/fentanyl. Later that morning, at 10:05 a.m. (call #144), GUERRERO called JOE to say he was arriving with the drugs ("In two or three minutes, I'm here."). JOE asked if GUERRERO was in his neighborhood ("Oh, at the top of my street?") and GUERRERO affirmed ("Yes."). JOE said he was gathering money to meet GUERRERO ("I'll call you in five minutes. I'm getting ready."). In a subsequent call at 10:11 a.m., JOE called GUERRERO to let him know he was walking to meet him ("I'm walking now. I had to find the money. I'm so sorry.").

121.    As detailed above, on March 16, 2021, investigators seized half a kilogram of fentanyl from GUERRERO, which CARMONA delivered on behalf of CASTRO.

### 5. GUERRERO-HAYES

122.    Investigators intercepted GUERRERO's phone (Target Telephone #19) between February 17, 2021 and March 18, 2021. During that time, HAYES was intercepted using two

phones to order drugs from GUERRERO: (508) 364-8221 (the 8221 Number), which was subscribed to in his name at his residence; and (774) 602-6868 (the 6868 Number). As detailed below, HAYES purchases drugs from GUERRERO, which HAYES then redistributes to his own customers.

123.     On March 3, 2021, at 11:29 a.m. (call #116), HAYES used the 8221 Number to call GUERRERO. HAYES asked if he could meet GUERRERO ("Can I come up today?"), and GUERRERO agreed ("Okay, I'm ready, come on."). Later that day, at 3:18 p.m. (call #118), HAYES called GUERRERO, and Dilcia Ferreras ("DILCIA"), GUERRERO's girlfriend, answered the phone. HAYES said that he had arrived ("I'm here"), and DILCIA said she would let him in. Investigators who were conducting surveillance at GUERRERO's residence (Target Location #6) saw a van registered to HAYES' brother parked on Shetland Street near GUERRERO's residence at approximately 3:30 p.m. At 5:00 p.m., investigators saw HAYES exit Target Location #6, get into the van, and drive away. Investigators followed HAYES after he left Target Location #6. HAYES made one stop at a vape store before going directly to his residence (Target Location #10).

124.     Within minutes of HAYES leaving, GUERRERO called CASTRO and told him he had money to deliver to him. Based on the investigation, I believe HAYES delivered money to GUERRERO and picked up additional drugs, and that GUERRERO called CASTRO afterwards arranging to drop off money which GUERRERO owed from a prior drug debt.

125.     On March 8, 2021, at 12:28 p.m. (call #179), HAYES used the 8221 Number to call GUERRERO. HAYES asked if GUERRERO had drugs to sell ("You ready?"), and GUERRERO affirmed ("Yeah, my friend. I'm ready."). HAYES said he was going to "come up" and meet GUERRERO at the Home Depot where they could conduct their drug transaction in the

bathroom ("When I get there, I'll call you at Home Depot . . . And we'll go in the Home Depot. In the bathroom."). GUERRERO agreed ("Yeah, no problem."). At 2:13 p.m. (call #188), HAYES called GUERRERO to tell him he was at the Home Depot ("I'm at Home Depot."). GUERRERO said he was close by ("Give me 8 to 10 minutes."). At 2:25 p.m., GUERRERO called HAYES to confirm he was close and would meet him in the bathroom ("Two minutes . . . Yeah, two minutes in the bathroom.").

126.   Based on the intercepted calls, investigators were conducting surveillance in the area of the Home Depot, located in the South Bay Plaza in Dorchester. At 2:13 p.m., investigators saw HAYES arrive driving the van registered to his brother. HAYES got out of the van and entered the Home Depot. At the time, the location data from GUERRERO's phone and the GPS device on his Highlander indicated they were both in the vicinity of 13 Shetland Street (Target Location #6). At 2:23 p.m., GUERRERO left from the area of 13 Shetland Street, and arrived at the Home Depot at 2:27 p.m. Investigators saw GUERRERO enter the Home Depot. Investigators saw GUERRERO and HAYES go into the bathroom inside the Home Depot, where they remained for a few minutes. They then departed in their respective vehicles, and surveillance was terminated. Based on the investigation to date, I believe GUERRERO sold drugs to HAYES inside the bathroom.

127.   On March 12, 2021, HAYES used the 6868 Number to call GUERRERO. GUERRERO asked if this was HAYES' new number ("This your number?"). HAYES replied he used this phone only to talk to GUERRERO ("This is my new number for you only. Just to call you . . . I only call you and your wife from this phone . . . Nobody else."). GUERRERO agreed ("Okay good. Very good."). HAYES said he still had his old phone ("So my old phone . . . I still have it . . . but I'm only gonna call you from this one."). HAYES explained that he had purchased

yet another phone for his customers ("So then I have another phone, not my old phone. I got another phone for other people."). GUERRERO agreed. HAYES clarified that he now had three phones that he used for his drug trafficking business ("So I have three now for everything. So it's good."). I believe HAYES compartmentalized the use of his phones to avoid law enforcement detection.

128.    On March 14, 2021, at 3:31 p.m. (call #318), HAYES used the 6868 Number to call GUERRERO (over Target Telephone #19). HAYES said he had arrived ("Yeah, I am here."). GUERRERO then put DILCIA on the phone to talk to HAYES. DILCIA asked if HAYES was concerned about conducting drug deals at certain locations ("So Rafael would like to know if you have any concerns about you come here or if you see something different."). HAYES said he had seen a police car near his house ("Yeah, well. Listen, the other day there was a cop on the road like, off my house. You know not even near my house, just sitting there, and I didn't like."). HAYES explained that he got nervous when he saw the police car and went back to his home and hid all of his drugs ("So I'm like, 'Okay.' . . . I left the gas station. I watched him. He was stuck in an area, he couldn't get out. So, I fucking blasted right back to my house, grabbed everything, hid everything, everything was fine. And I said, 'That's a sign . . . You know what I mean? Even if it wasn't for me it was a sign. So, basically like I am cleaning like all my tracks up. Like I don't want to go to your house."). DILCIA understood ("Yup."). HAYES explained he had changed his phones after seeing the police near his residence ("So that's why I changed phones. I have your phone number and his phone number in this phone, period! I've never spoke the numbers out over the phone."). HAYES continued to explain he had changed his phone number so that if he got arrested, the police would not be able to link GUERRERO to him ("Tell him when I seen him today I was gonna say, 'Hey, you gotta have Dilcia get in touch with me so I can talk to her about

this. Let her know what I'm trying to do here.' So basically, I'm just trying to see if anything happens, it happens to me, but I don't want to lead nowhere else . . . That's it. You know, you guys have a family man and you know, my brother is my brother. He's fine. If I'm locked up, it's fine, but you guys can't be."). DILCIA thanked HAYES for his consideration ("Yeah. Thank you very much . . . We appreciate that."). HAYES said that everyone needed to protect each other to ensure the drug business continued ("You know, the money needs to keep moving in too for everybody . . . it's gotta keep going. Period."). HAYES said they should probably meet one additional time in a neutral location to conduct their drug deals instead of at their residences to ensure law enforcement was not surveilling them ("And probably one other time and then after that I think I'm good."). DILCIA told HAYES to keep a watchful eye ("So you keep an eye on everything and then you can continue like normal, but now you're careful with everything, that's good."). HAYES again said he used only one phone to contact GUERRERO and DILCIA and another phone for his drug customers ("But listen, so anyways, I still have all my phones . . . but I won't call you from them . . . Your names are not in them or nothing . . . So everything is all wiped out . . . And then I have just one phone solely just for customers."). I believe HAYES had met with GUERRERO prior to this call to buy drugs, and that HAYES then called to explain to DILCIA, who speaks English, that he had gotten additional phones to insulate himself and GUERRERO and DILCIA from law enforcement detection.

**Target Locations**

***Description and Criminal Activity at Target Locations***

**(1)  CASTRO's Residence – Target Location #1**

Description of Target Location #1

129.    **176 Brook Road, Apt. 1 and detached rear garage, Milton, Massachusetts ("176 Brook Road")** is a two- family residential dwelling with gray wooden shingles and white trim. The common entrance is located in the front, to the left side of the dwelling facing Brook Road. The entry door is brown and encased in white trim and contains a large egg-shaped window which is located in the middle, upper portion of the door. Located above the door on the casing is the number "176," which appears to be in black writing. The front porch area has double decks, one lower deck and a second-floor deck. The deck is supported by three white columns and cast iron railings, which lead to a set of stairs. There are two mailboxes affixed to the right of the entry door. Target Location #1 is the first-floor apartment and the detached rear garage. A detailed description and photograph of Target Location #1 appear in Attachment A-1, which is attached hereto and incorporated herein by reference.

130.    Based on physical and electronic surveillance and intercepted calls, I believe CASTRO lives at this residence with INGRID and WASCAR. Since approximately September 2020, on numerous occasions investigators have seen CASTRO coming and going from 176 Brook Road, and vehicles he is known to use have been parked in the driveway of 176 Brook Road and the adjacent street. Since at least September 2020, investigators have been obtaining location data for phones used by CASTRO (Target Telephones #13, #14, #15, #16, and #17). Since that time, the precise location data for those phones established a consistent pattern of CASTRO's daily and nightly locations. CASTRO spends nights at Target Location #1 and goes

to El Rincon (Target Location #5) on a near daily basis. CASTRO makes frequent trips to 800 Hyde Park Avenue, and those trips normally coincided with intercepted calls indicating he was arranging either drug or money transactions. The phone location data for CASTRO's most recent phone (Target Telephone #15) indicated it was in the vicinity of 176 Brook Road most nights and the early morning hours, including most recently as March 16, 2021. Investigators believe CASTRO uses the garage in the rear of 176 Brook Road to store vehicles that are used to transport and store drugs and drug proceeds. The utilities for Target Location #1 are listed in INGRID's name.

Link to Criminal Activity

131.    As detailed in this affidavit, CASTRO is the leader of a DTO that purchases and distributes large quantities of cocaine and fentanyl and collects drug proceeds on behalf of the Sinaloa DTO. CASTRO has been intercepted on a daily basis discussing the acquisition and distribution of drugs and the collection of drug debts. CASTRO employees at least two couriers who assist him in his large-scale drug distribution and money laundering business. Since August 2020, CASTRO has been intercepted using at least six different phones during the course of this investigation. As detailed above, investigators seized fentanyl from HERAUX and GUERRERO after calls indicated they were in possession of drugs sold by CASTRO. Accordingly, I believe that evidence of CASTRO's ongoing drug trafficking and money laundering activities, including drugs, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, and drug proceeds, as set forth in Attachment B, will be found at Target Location #1.

   **(2)  HERAUX's Residence – Target Location #2**

Description of Target Location #2

132.   **1366/1368 River Street, left rear apartment, Hyde Park, Massachusetts** ("1366/1368 River Street") is a multi-family residential dwelling with blue vinyl siding and white trim. The common entrance is located in the front of the dwelling facing River Street. The entry door is a white storm door encased in white trim, which leads to a common entry area with two white doors on the left and right sides. The doors have a half moon shaped window at the top of the door. Located on the right-hand side of the storm door on the casing is the number "1368," which appears to be in black writing. Target Location #2 is the rear ground floor apartment, which is located on the left hand side of 1366/1368 River Street when facing the dwelling from the rear. The door is metal and white in color, there is a sticker on the middle left hand side of the door and the door knob is gold in color. A detailed description and photograph of Target Location #2 appear in Attachment A-2, which is attached hereto and incorporated herein by reference.

133.   Based on physical and electronic surveillance and precise data location for HERAUX's phone (Target Telephone #18), I believe HERAUX lives at Target Location #2. Investigators have seen HERAUX coming in and out of the door to Target Location #2 at times that are consistent with him living at that location. Most recently, on March 21, 2021, HERAUX was seen coming from the rear of 1366/1368 River Street, which is the location to the door for Target Location #2. Moreover, the phone location information for Target Telephone #18 indicated it was in the vicinity of Target Location #2 in the nighttime and early morning hours, and the location data for the phone most recently used by HERAUX also indicated it was in the vicinity of Target Location #2, including as recently as March 15, 2021 (HERAUX stopped using this phone on March 15, 2021). Investigators have seen both HERAUX and CASTRO use the door to Target Location #2 when entering or exiting the building. HERAUX was seen leaving this address after intercepted calls indicated he was going to deliver and/or pick up drugs or drug proceeds.

<u>Link to Criminal Activity</u>

134.     As detailed throughout this affidavit, HERAUX is CASTRO's primary drug and money courier. HERAUX has been intercepted using Target Telephone #18 throughout the investigation. HERAUX stopped using Target Telephone #18 on February 26, 2021, after investigators seized fentanyl from the vehicle he was driving. After this, he began using a new phone ((857) 340-1816). On January 8, 2021, investigators saw HERAUX carry a bag from Target Location #2 and place it in the Honda Pilot. As detailed above, investigators stopped HERAUX after he left Target Location #2 and seized $150,000 from the Honda Pilot. Accordingly, I believe that evidence of HERAUX's ongoing drug trafficking and money laundering activities, including records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, and drug proceeds, as set forth in Attachment B-1, will be found at Target Location #2.

    **(4)**    **La Bamba Market  – Target Location #4**

    <u>Description of Target Location #4</u>

135.     **1 Lorne Street, Dorchester, Massachusetts** is a commercial space or "bodega." The exterior is red brick and the front door is made of glass with the handle on the right hand side of the door. There is a set of four steps with cast iron railings leading to the front door. Above the door is a green and yellow awning with "La Bamba Market since 1996" written on it. There are windows on the front of the building covered by cast iron grates. The common entrance faces Harvard Street. A detailed description and photograph of Target Location #4 appear in Attachment A-4, which is attached hereto and incorporated herein by reference.

136.     Investigators believe that CASTILLO's family owns Target Location #4. Felix CASTILLO, CASTILLO's brother, is the listed owner of La Bamba Market. Investigators have

seen CASTRO, HERAUX, CARMONA, and GUERRERO at Target Location #4 numerous times. Most recently, CARMONA met GUERRERO outside of Target Location #4 on March 16, 2021.

Link to Criminal Activity

137.    On numerous times during this investigation, CASTRO has directed drug customers, including GUERRERO, to Target Location #4 to conduct drug sales. CASTRO has also directed customers and money launderers to Target Location #4 to either pickup or deliver money.

138.    For example, as detailed above, on October 28, 2020, HERAUX delivered $64,000 to VALDEZ after CASTRO directed VALDEZ to Target Location #4.

139.    On November 3, 2020, at 5:40 p.m. (call #460), CASTRO received a call over Target Telephone #13 from (646) 683-8567 and spoke with an unidentified male ("UM6079."). UM6079 told CASTRO he was traveling to the Boston area to meet CASTRO ("I'm almost heading down there. Once I'm almost in Dorchester I will call you so you can send me the address. I could go to wherever you are."). CASTRO agreed and said he would send the address for the meeting ("Yes, I'm around here. You reach out, and I'll send you the address."). UM6079 said he needed to count the money but was planning to bring $20,000 ("Alright, that's fine. The tickets need to be counted. I'm bringing a ventana" ). CASTRO acknowledged ("Okay, chill. Accommodate well there."). Later that evening at 6:27 p.m., (call #461), UM6079 called CASTRO to say he was in the area to deliver the money ("I'm already around here."). CASTRO said he would send an address ("I will send you the address right now, Patron."). After ending the call, CASTRO sent a text message to UM6079 with the address to the La Bamba Market ("1 lorne

st Dorchester."). I believe CASTRO directed UM6079 to deliver the $20,000 to the La Bamba Market, and that the payment was to satisfy an outstanding drug debt.

140.    The following day, on November 4, 2020, at 1:36 p.m. (call #469), UM6079 called Target Telephone #13 and spoke to CASTRO. UM6079 called to check on the delivery and to let CASTRO know that he was leaving the Boston area ("I got up early. I woke up in that area, and I had to come up early."). CASTRO said he had been waiting for UM6079's call but had gotten distracted and confirmed that he had counted the $20,000 that UM6079 had delivered to La Bamba Market ("Okay. I did not call you because I thought it was better to wait for your call, because I forgot to call you last night with the elections and shit. But I already counted and everything is okay. 20 pesos."). UM6079 confirmed that all of the money was there ("All good?"), and CASTRO affirmed ("Yes, 20 pesos. Correct!"). CASTRO encouraged UM6079 to keep selling drugs and paying his debts ("Keep moving forward. Activated damn! . . . That's what we want, so you know my brother."). UM6079 agreed ("Yes, God willing!").

141.    On November 30, 2020, HERAUX delivered $75,000 to a UC at Target Location #4 and entered the La Bamba Market after the delivery.

142.    More recently, on March 16, 2021, CARMONA was seen exiting Target Location #4 where he met with GUERRERO. I believe during that meeting CARMONA gave GUERRERO the fentanyl that investigators later seized.

143.    Based on the investigation to date, CASTRO's CASTILLO's, HERAUX's, and CARMONA's long-term involvement in drug trafficking, and the money and drug seizures from members of the targeted DTO during the course of this investigation, I believe there is probable cause to believe that evidence of ongoing drug trafficking and money laundering activities, as set forth in Attachment B, will be found at Target Location #4.

### (5)  EL RINCON – Target Location #5

Description of Target Location #5

144.   **18 Fairmount Avenue, Hyde Park, Massachusetts,** ("El Rincon") is a commercial restaurant, made of red bricks and is located on the street level underneath apartments. The front door is made of glass with the handle on the left hand side of the door. The door is located under a white sign with "Carbinero Rincon Restaurant" written above it. On the bottom right hand corner of the sign is the number "18" written in black. There are windows on the front of the building with white curtains. A detailed description and photograph of Target Location #5 appear in Attachment A-5, which is attached hereto and incorporated herein by reference.

145.   INGRID, CASTRO's paramour, works at El Rincon. The utilities for the restaurant are in the name of Dawrin Pinales, who is believed to be INGRID's relative. Based on physical surveillance, location data for phones used by CASTRO and HERAUX, and intercepted calls, I believe CASTRO uses Target Location #5 to conduct his drug and money laundering business. Based on intercepted calls, I believe INGRID is involved in CASTRO's drug and money laundering activities. As detailed herein, CASTRO uses couriers to deliver and pickup drugs and drug proceeds. Accordingly, I believe CASTRO uses Target Location #5 as a safe location from which he operates his drug and money laundering activities and stores drug proceeds.

Link to Criminal Activity

146.   Throughout this investigation, CASTRO has gone to Target Location #5 on a near daily basis, and he spends hours there at a time. Investigators have seen CASTRO enter the location numerous times. The precise location data for CASTRO's most recent phone (Target Telephone #15) indicated it was at this location most recently on March 13, 2021. CASTRO stopped using this phone after the March 16, 2021 drug seizure from GUERRERO. As detailed

throughout this affidavit, CASTRO has gone to Target Location #5 either prior to or after the delivery or pickup of drugs and/or drug proceeds. I believe CASTRO stores drug proceeds and records of his drug and money laundering activities at Target Location #5.

147.    For example, prior to investigators seizing $150,000 from HERAUX on January 8, 2021, HERAUX picked up CASTRO at Target Location #5, and they returned to this location prior to the stop. Investigators believe CASTRO picked up drug proceeds that were stored at Target Location #5, which he gave to HERAUX.  At the time of the stop, CASTRO was as Target Location #5.

148.    As detailed above, on February 26, 2021, investigators seized approximately 250 grams of suspected fentanyl from HERAUX. After the seizure, HERAUX took a taxi to La Bamba Market, where he was picked up by a vehicle registered to DARWYN Pinales. The last location data for Target Telephone #18 indicated it was at El Rincon at approximately 4:41 p.m. The location data for CASTRO's phone (Target Telephone #15) indicated it was at El Rincon at the same time.

149.    Based on the investigation to date, CASTRO's long-term involvement in drug trafficking, INGRID's involvement in CASTRO's drug trafficking activities, intercepted calls that indicate CASTRO and HERAUX use this location to conduct drug business, and physical and electronic surveillance observations detailed herein, I believe there is probable cause to believe that evidence of CASTRO's ongoing drug trafficking and money laundering activities, including drug ledgers and records and drug proceeds, as set forth in Attachment B-1, will be found at Target Location #5.

### (7) GUERRERO's Residence – Target Location #6

<u>Description of Target Location #6</u>

150.   **13 Shetland Street, Apt. 419, Roxbury, Massachusetts ("13 Shetland Street")**
is a red and gray brick multi-unit apartment building. The common entrance is located in the front
center of the building facing Shetland Street. The entry doors are made of glass and have a silver
handle, and there are doors on both the left and right sides of the main entry way. Located above
the door on the left is glass and encased in black metal is the number "13" written in white letters.
On the square glass window of the door are the words "The Cara Apartments." There is a series
of windows that run vertically above the front entry way. The door to the right is the same as the
door on the left, with "Cara Apartments" written in white on the square glass window. There is a
shared parking garage located on the right hand side of the building. A detailed description and
photograph of Target Location #6 appear in Attachment A-6, which is attached hereto and
incorporated herein by reference.

151.   I believe GUERRERO resides at Target Location #6 because it is the address listed
on his expired Massachusetts driver's license. The utilities for Target Location #6 are in the name
of Dilcia Ferreras, who, based on intercepted calls, is GUERRERO's girlfriend and drug courier.
DILCIA has been intercepted over Target Telephone #19 speaking in English to GUERRERO's
drug customers and arranging drug deals. The data location for GUERRERO's  phone (Target
Telephone #19) indicated it was at this location on a nightly basis.

Link to Criminal Activity

152.   The phone data and the GPS device on GUERRERO's Highlander indicated it left
from this location on March 16, 2021, prior to GUERRERO meeting CARMONA outside of La
Bamba.

153.   On March 17, 2021, at 3:16 p.m. (call #388), GUERRERO called (857) 258-3108
and spoke with DILCIA, his girlfriend. During the call, GUERRERO and DILCIA discussed the

March 16 stop and seizure of his vehicle. GUERRERO asked DILCIA if he should get a new phone ("Do you want me to stop by there, to buy another number?"). DICLIA replied, "Yes . . . So we can talk freely."). GUERRERO said that the police officer had not taken his phone (Target Telephone #19) during the stop. GUERRERO said he did not think changing his number would make a difference ("Whatever happens will happen. No matter what! The hit was last night."). GUERRERO complained that he had not been able to reach CASTRO ("Sancochito has vanished"), and DILCIA replied that CASTRO knew what he was doing when he sent the courier to deliver the drugs to GUERRERO ("He knew what he was dealing with.").

154.    Later that day, at 4:18 p.m. (call #395), GUERRERO again called DILCIA to discuss the seizure. GUERRERO said he believed that CASTRO was responsible for the stop ("That was Sancochito."). During the call, GUERRERO told DILCIA that he had moved a safe containing drug proceeds into a room ("I moved the safe to the little room . . . And I put the money from the piggy bank in there, and I brought it all over there. Understand?"). DILCIA agreed ("Okay."). GUERRERO then said his brother was looking for a place for him to rent so he could move ("My brother is looking for a room."). GUERRERO said he was waiting for his brother to pick him up so he could deliver drugs to HAYES ("So all he has to do is the other and pick my up so I can go see Kevin."). GUERRERO said he was no longer going to buy drugs from CASTRO but instead was going to purchase from a different supplier ("I will not be calling that man again. I'm going to be getting that elsewhere . . . I have never had any issues while carrying anything. I mean driving.").  In a subsequent call, GUERRERO told DILCIA that he was picking up a new phone ("I am going now to go pick it up. He already activated.").

155.    On March 18, 2021, at 9:39 a.m. (call #414), GUERRERO called (857) 869-4674 and spoke with an unidentified male ("UM4674."). UM4674 asked if Target Telephone #19 was

GUERRERO's phone. GUERRERO replied that it was, but he was getting a replacement phone ("Yeah, but I will get another one soon because when I came back the man had closed."). GUERRERO asked if UM4674 had drugs available ("I wanted to know your response."), and UM4674 said he would call his supplier and let GUERRERO know ("I will call the guy, because I stayed last night waiting. I'm going to call him and then I'll call you back."). At 9:46 a.m., UM4674 called GUERRERO back and said he would have drugs soon ("Yes, he told me, 'Yes,' like in two hours more or less."). GUERRERO asked if the drugs were good quality ("Okay, but it's hard? Can I trust in that?"). UM4674 assured him that the drugs were quality ("Of course. I told him exactly what's the deal just now. You will see it."). GUERRERO said he wanted to purchase a half kilogram of fentanyl ("Because I'm going to grab that to prepare it. You know that I grab in half, you know what I mean?"). UM4674 said GUERRERO could sample a portion of the drugs before buying ("Yes, I know. I will explain to him exactly what's up. Listen to me, you will grab a corner and check it. If you like it, you work with that."). Based on prior intercepted calls, I believe GUERRERO was ordering a half kilogram of fentanyl, which he has previously referred to as "hard" in other intercepted calls.

156.    At approximately 11:18 a.m., GUERRERO stopped using Target Telephone #19, apparently because his new phone had been activated.

157.    Based on the investigation to date, GUERRERO's long-term involvement in drug trafficking, the fact that investigators observed GUERRERO leaving his residence prior to conducting drug transactions, and calls after the March 16 seizure indicate he was still acquiring and distributing drugs, there is probable cause to believe that evidence of GUERRERO's ongoing drug trafficking activities, including drugs, drug ledgers and records, phones used to conduct his

drug business, and drug proceeds, as set forth in Attachment B, will be found at Target Location #6.

**(7)      CARMONA's Residence (Target Location #7)**

Description of Target Location #7

158.      **37 Holworthy Street, Apt. 2, Dorchester, Massachusetts**  ("37 Holworthy Street") is a three level, multi-unit, red brick apartment building. The common entrance is located in the front center of the building facing Holworthy Street. The entry door is made of glass, encased with green trim, and has a silver handle on the right hand side. Located above the door is a glass, four-paneled roof overhang. Above the door written in silver writing is the number "37." There is a set of three steps with black railings on either side of the staircase leading to the main door of building 37. A detailed description and photograph of Target Location #7 appear in Attachment A-7, which is attached hereto and incorporated herein by reference.

159.      I believe CARMONA is currently residing at Target Location #7 because the location data for his phone indicates it is in the vicinity of Target Location #7 on a near nightly basis. Moreover, CARMONA's Massachusetts driver's license lists the address for Target Location #7 as his residence, and the utilities for Target Location #7 are in the name Consuelo Victorinino, who is believed to be CARMONA's mother. The precise location data for CARMONA's phone showed it was at Target Location #7 most recently on March 18, 2021.

Link to Criminal Activity

160.      On March 16, 2021, the location data for CARMONA's phone indicated it left the vicinity of  Target Location #7, went to 800 Hyde Park Avenue, and then to La Bamba Market. As detailed above, investigators saw CARMONA exit La Bamba Market to meet with GUERRERO prior to investigators seizing drugs from GUERRERO. Based on the investigation

to date, CARMONA's involvement with both CASTILLO and CASTRO, I believe there is probable cause to believe that evidence of CARMONA's ongoing drug trafficking activities, including phones used to conduct his drug trafficking and money laundering activities, drug records, and drug proceeds, as set forth in Attachment B-1, will be found at Target Location #7.

**(8)** **SONGFENG's Residence – Target Location #8**

Description of Target Location #8

161.   **229 North Central Avenue, Quincy, Massachusetts** ("229 North Central Avenue") is a single family residential home with yellow vinyl siding and white trim. The main entrance is located on the front right side of the house facing North Central Avenue. There is a staircase with black cast iron railings leading to a white storm door and a white door behind the storm door. The number "229" is written in black lettering on the left hand side of the door on the door casing. There is a black mailbox located to the left of the door and a doorbell under the number 229. There is also a driveway on the left hand side of the dwelling. A detailed description and photograph of Target Location #8 appear in Attachment A-8, which is attached hereto and incorporated herein by reference.

162.   I believe SONGFENG resides at this location. Investigators have seen SONGEFENG at Target Location #8, most recently on March 21, 2021. Between December 2020 and early January 2021, the location data for SONGFENG's phone indicated it was at this location on a nightly basis. SONGFENG's Massachusetts driver's license lists Target Location #8 as his residential address. Oddly, there is no listing for utilities at Target Location #8. On November 5, 2020, SONGFENG gave a police officer the address for Target Location #8 as his residence after investigators seized $150,000 from his vehicle.

Link to Criminal Activity

163.    As detailed above, SONGFENG was intercepted over Target Telephone #13 exchanging a serial number for a dollar bill with CASTRO. The call indicated that another money broker had put CASTRO in touch with SONGFENG to arrange a money pickup. As detailed above, investigators seized $150,000 from SONGFENG after CARMONA delivered the money, which were drug proceeds, to SONGFENG. After the seizure, SONGFENG went to the police station attempting to recover the money. SONGFENG lied about the source of the funds.

164.    Accordingly, there is probable cause to believe that evidence of SONGFENG's money laundering activities, including phones and computers used to conduct money laundering transactions, financial records, and drug proceeds, as set forth in Attachment B-1, will be found at Target Location #8.

### YING's Residence – Target Location #9

Description of Target Location #9

165.    **160 Pleasant Street, Apt. 801, Malden Massachusetts** ("160 Pleasant Street") is described as a multi-level gray and tan brick condominium complex, with a parking garage on the bottom. The main entrance is located in the middle with a deck above it. The number "160" is written in large gold numbers above large glass double entry doors. The number "160" is also written on the pane of square glass between the two entry doors. A detailed description and photograph of Target Location #9 appear in Attachment A-9, which is attached hereto and incorporated herein by reference.

166.    I believe YING resides at this location. Apartment 801 has been leased in YING's name since October 2019, and an apartment manager confirmed that YING is currently residing in Target Location #9. Moreover, YING's Massachusetts driver's license lists the address for

Target Location #9 as his residential address. YING was last seen at 160 Pleasant Street on March 19, 2021.

Link to Criminal Activity

167.    As detailed herein, on October 21, 2020, investigators intercepted a series of calls between CASTRO and CINDY during which they arranged for CASTRO to deliver $100,000 in drug proceeds to CINDY. CINDY directed CASTRO to 160 Pleasant Street and gave CASTRO the description of YING. Investigators observed CARMONA deliver a bag to YING, who took the bag and immediately entered into the building at 160 Pleasant Street.

168.    As detailed above, investigators subpoenaed records relating to financial accounts held in YING's name. Those records reflect that YING has engaged in suspicious financial transactions on a prolonged basis, including a cash deposit for $150,000 on March 11, 2021. Accordingly, I believe evidence of YING's money laundering activities, including phones and computers used in furtherance of money laundering, financial records, and drug proceeds, as further detailed in Attachment B-1, will be found at Target Location #9.

**(10)  HAYES' Residence – Target Location #10**

Description of Target Location #10

169.    **55 Larch Lane, Centerville, Massachusetts** ("55 Larch Lane") is a single family, one story, residential home with light gray vinyl siding, white trim and black shutters on the windows. On the right hand side of the residence is a attached single car garage with a white door. The main entry door is a four paneled black door with 2 small square windows at the top. The door is encased in white trim, the number "55" is posted in dark letters on the door casing on the right side. There are two exterior lights to the right and left of the front door. A detailed description

and photograph of Target Location #10 appear in Attachment A-10, which is attached hereto and incorporated herein by reference.

170.     Investigators observed HAYES go to Target Location #10 after his drug deal with GUERRERO on March 3, 2021, and have seen the van that he is known to drive parked in the driveway of Target Location #10 (most recently, on March 16, 2021). Moreover, one of the phones HAYES used to order drugs from GUERRERO was subscribed to in his name at the address for Target Location #10, and his Massachusetts driver's license lists the address for Target Location #10 as his residence.

Link to Criminal Activity

171.     As detailed above, investigators followed HAYES back to Target Location #10 after he met with GUERRERO on March 3, 2021 to purchase drugs. On March 14, 2021, HAYES was intercepted over Target Telephone #19 telling DILCIA that he had hidden drugs in his house after he saw a police officer in his neighborhood. HAYES also told DILCIA he had purchase two new phones to conduct his drug trafficking business. Accordingly, I believe there is probable cause that evidence of HAYES' ongoing drug trafficking activities, including drugs, phones used to conduct his drug business, ledgers documenting drug transactions and outstanding debts, drug proceeds, and other evidence set forth in Attachment B, will be found at Target Location #10.

DRUG TRAFFICKER'S AND MONEY LAUNDERER'S USE OF RESIDENCES AND CELLULAR TELEPHONES

172.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and

distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

173.   I also know from my training and experience that drug traffickers have an interconnected and symbiotic relationship with money launderers. Drug suppliers operating outside of the United States rely on illicit money brokers and money launderers to launder and repatriate their drug proceeds. The money launderers need to keep detailed records of their financial transactions to show proof of the laundering. After the money is deposited into accounts, many of the financial transactions made in furtherance of laundering are conducted electronically either using phones or computers. It is common for money launderers to keep detailed records of their financial transactions, including the account numbers to which they send laundered proceeds. I know that many of these records are stored in electronic devices, such as phones and computers. Moreover, it is common for money launderers to collect large sums of drug proceeds and store them before laundering to reduce the number of times they are required to make trips to deposit the sums into the banking or financial systems.

174.   Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers and money launderers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-

keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

175.    Likewise, money launderers keep detailed records of their financial transactions to evidence them. Because money launderers provide repeated services to some DTOs, it is necessary for them to maintain these records for extended periods to avoid unnecessary and duplicative exchanges of banking account information. This information is normally stored in the electronic devices that money launderers use to conduct financial transactions, such as cell phones and computers.

176.    Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence. Such documents include rental or storage property agreements and receipts.

177.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers and money launderers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances,

and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering are often kept in their residences. Moreover, the cash proceeds of drug trafficking and money laundering often contain traces of the narcotics sold or bought by the drug dealers.

178.    Moreover, drug traffickers and money launderers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking/money laundering activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

179.    When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

180.    Finally, as noted above, evidence of drug and money laundering crimes can be found in the cell phones, smart phones, and computers referenced in the preceding paragraphs.

Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B and B-1 on their cellular telephones and computers.

181.    It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

182.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover

evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

183.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

184.    The Target Locations to be searched may contain computer equipment whose use in the Target Offenses or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive

determination of their ownership at the premises during the execution of this warrant. If the things described in Attachments B and B-1 are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

185.    The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachments B or B-1 because they are associated with (that is used by or belong to) one of the Target Subjects. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

186.    In this case, I recognize that the La Bamba Market (Target Location #4) and El Rincon (Target Location #5) are functioning companies that perform some legitimate business functions, and that seizing computer equipment may have the unintended and undesired effect of limiting the companies' abilities to function.

187.    As stated above, there are a variety of reasons why law enforcement agents might need to seize the computer equipment for subsequent processing elsewhere. If El Rincon or La Bamba Market require access to data that is not contraband or evidence of a crime, the government will work with the company after the search to copy this data onto storage media provided by the company for the company's use.

188.    If the search team determines that there is no reason to seize certain of La Bamba Market's or El Rincon's computer equipment during the execution of this warrant, the team will

create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical.  Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files.  Imaging permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment. However, imaging at the premises can often be impractical, because imaging is resource-intensive:  it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than they would remain if they seized the items, and it can require personnel with specialized experience and specialized equipment, both of which might be unavailable. If law enforcement personnel do create an image at the premises, they will then search for the records and data specified in the warrant from the image copy at a later date off site.

189.    This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

190.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other

manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

191.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

192.    The passcode that would unlock the Subject Device/Apple device(s) found during the search of the Target Locations is not currently known to law enforcement. However, during the course of this investigation, a number of Target Subjects have used Apple iPhones to conduct their drug and money laundering business. Thus, it may be useful to press the finger(s) of the user(s) of the Subject Device/Apple device(s) found during the search of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

193.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Locations to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

194.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects or co-conspirators identified in this affidavit to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

195.    I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related and/or money laundering evidence typically have been recovered in both conventional and electronic formats:

    a.   controlled substances;

    b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and

mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.  firearms and other dangerous weapons; and

i.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

196.    Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking and/or money laundering. I believe that evidence of their drug trafficking and/or money laundering offenses will be found inside each of the Target Locations and on certain cellular telephones, computers, or electronic equipment seized therefrom.

## **CONCLUSION**

197.    Based on the information set forth above, I believe probable cause exists to conclude that Target Subjects have conspired to possess with intent to distribute, and to distribute 400 grams or more of fentanyl, heroin, and cocaine, in violation of 21 U.S.C. §846 and conspiracy to launder money, in violation of 18 U.S.C. §1956(h), and that evidence of said criminal offenses, as set forth herein and in Attachments B and B-1 of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

I, Mark J. Concannon, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

/s/ Mark J. Concannon

_____

MARK J. CONCANNON
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION


Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this ___th day of March 2021.

                    22nd

_____

HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS